## 19687

James H. LESLEY, As Administrator of the Estate of James G. Lesley, Respondent, v. AMERICAN SECURITY INSURANCE COMPANY, Appellant.

(199 S. E. (2d) 82)

*James C. Parham, Jr.,* of *Wyche, Burgess, Freeman &*
*Parham,* Greenville, *for Appellant,* cites:

*Messrs. Joseph E. Major,* and *J. D. Todd, Jr.,* of *Leather-*
*wood, Walker, Todd & Mann,* Greenville, *for Respondent,*

cite:

August 30, 1973.

BUSSEY, Justice:

In this action upon an insurance policy issued by appellant, plaintiff, upon a jury trial, recovered a verdict of $27,288.46, plus interest from the date of denial of coverage by the appellant. After verdict, appellant moved for judgment *n. o. v.* and in the alternative for either a new trial or a new trial *nisi,* all of which were refused.

Plaintiff's intestate, James G. Lesley, was for a number of years engaged extensively in the poultry and feed business in Pickens County. On February 13, 1971, he owned, *inter alia,* "an environmentally controlled pullet house" in which he had some 34,000 young pullets which had been hatched on or about November 10, 1970. In such a poultry

house the air is constantly being changed by a number of electric fans which are thermostatically controlled. Mr. Lesley's source of electric power was the Blue Ridge Electric Cooperative. Shortly before 2 A. M. on February 13, 1971, there was a severe thunderstorm in the neighborhood and an interruption of the electrical power on Blue Ridge's line furnishing power to Mr. Lesley, which commenced, according to the evidence, at ten minutes to two and lasted until approximately 6 A. M. As a result of this cessation of power for approximately four hours, with the fans not operating, some 19,767 of Mr. Lesley's chickens died from excessive heat or suffocation.

The pullets in the particular poultry house were financed by Mr. Lesley through Blue Ridge Production Credit Association which required an insurance policy to protect it. Mr. W. R. Taylor, manager of the Association, on behalf of Mr. Lesley procured the necessary policy from the appellant. According to the usual procedure, the appellant forwarded the original policy and a copy to Mr. Taylor, the original being retained by the Association and the copy delivered to Mr. Lesley.* The policy provided coverage, *inter alia,* against "death of the poultry, directly and immediately resulting from: (a) fire and lightning * * *." The loss of the poultry was promptly reported to the appellant who shortly thereafter denied liability under its policy and this litigation ensued.

Appellant first contends that it was entitled to a directed verdict, asserting that there was no competent evidence that the power interruption was caused by lightning, but even if so caused, no proof that the loss was the "direct and immediate" result of the power interruption by lightning. It is, of course, elementary that in considera-

---

* Inadvertently, the amount of the maximum coverage per bird, to-wit: $1.50, was not filled in on Mr. Lesley's memorandum copy. Absent any showing of Mr. Lesley being misled or overreached thereby the rights of the parties were controlled by the actual policy which was completed and issued in accordance with the detailed letter of application therefor.

tion of a defendant's motion for a directed verdict, all of the evidence and the inferences reasonably deducible therefrom have to be viewed in the light most favorable to the plaintiff. A number of witnesses possessed of considerable education and experience in matters electrical testified as to the probable cause of the power failure, none of them professing to know the precise cause. We think no useful purpose could be served by reviewing the testimony of all these witnesses, some of which is rather technical. Suffice it to say that viewed in the light most favorable to the plaintiff, there is abundant competent evidence from which a jury could reasonably have inferred that in point of fact lightning did cause the power failure, and that the death of the chickens was the "direct and immediate result" of lightning, within the meaning and intent of the policy.

Appellant next contends that the trial court erred in equating the terms "directly and immediately" with "proximate cause". His Honor charged the jury that in order for the plaintiff to recover, he had to prove that lightning was the direct and immediate factor in bringing about the death of the chickens and that lightning was the proximate cause, defining proximate cause as follows:

"Now, proximate cause is the efficient cause. Proximate cause means literally the cause nearest in point of time. But under the law it does not necessarily mean that. It means here the efficient cause, it is the direct cause, the cause without which the loss would not have occurred. So, it is your duty to decide what was the proximate cause of the death of the chickens."

We are not convinced that the charge complained of was erroneous. There is authority in this State for the proposition that the terms "proximate and immediate" are virtually synonymous. *Suber v. Parr Shoals Power Co.,* 113 S. C. 317, 102 S. E. 335. In 43 Am. Jur. (2d) 1100, Insurance, Sec. 1182, Proximate Cause, we find the following:

"The general rule of insurance law is that only the proximate cause of loss, and not the remote cause, is to be regarded in determining whether recovery may be had under a policy of insurance, and that the loss must be proximately caused by a peril insured against. But proximate cause has a different meaning in insurance cases than it has in tort cases. In tort cases the rules of proximate cause are applied for the single purpose of fixing culpability, and for that reason the rules reach back of both the injury and the physical cause to fix the blame on those who created the situation in which the physical laws of nature operated; in insurance cases the concern is not with the question of culpability or why the injury occured, but only with the nature of the injury and how it happened. The maxim *'in jure, non remota causa sed proxima spectatur,'* is applied in a much more literal sense to cases in which the liability of an insurer is to be ascertained than to those involving a breach of contract or a tort. If the nearest efficient cause of the loss is one of the perils insured against, the courts look no further. In such cases the insurer is not to be relieved from responsibility by showing that the property was brought within the peril insured against by a cause not mentioned in the contract. "If the nearest efficient cause of the loss is not a peril insured against, recovery may nevertheless be had if the dominant cause is a risk or peril insured against. When it is said that the cause to be sought is the direct and proximate cause, it is not meant that the cause or agency which is nearest in point of time or place to the result is necessarily to be chosen, since the dominant cause may be concurrent or remote in point of time or place. In other words, in determining the cause of a loss for the purpose of fixing insurance liability when concurring causes of damage appear, the proximate cause to which the loss is to be attributed is or may be the dominant or efficient cause—the one that sets the others in motion—although other and incidental causes may be nearer in time to the result and may operate more immediately in producing the loss."

Appellant next asserts that having charged the law of proximate cause. His Honor should have charged "intervening cause." Assuming without at all deciding, that there is anything in the instant case to render a charge upon "intervening cause" appropriate, no issue of error because of failure to so charge is properly before us. Appellant requested no such charge and interposed no objection to the charge based upon the present contention.

Appellant's next contention is that there was error on the part of the trial judge in permitting respondent's counsel to argue certain matters to the jury. Appellant's objection to the jury argument does not appear in the record, nor was there any recordation of the argument. Reference to such is made in appellant's motion for a new trial and in His Honor's order denying a new trial. It is well settled that considerable latitude is allowed counsel in drawing inferences and deductions from the evidence and in arguing the same to the jury. *Johnson v. Life Ins. Co. of Georgia,* 227 S. Ct. 351, 88 S. E. (2d) 260. Arguments of counsel, and objections addressed thereto, of necessity have to be left largely to the sound discretion of the trial judge who is on the scene and in much better position than an appellate court to judge as to what is improper argument under the circumstances. *Crocker v. Weathers,* 240 S. C. 412, 126 S. E. (2d) 335. Appellant points to nothing in the record which convinces us that there was any abuse of discretion on the part of the trial judge in this respect amounting to a prejudicial error of law.

Appellant next complains of the admission of certain testimony from two witnesses for the respondent, Patterson and Crowe, each of whom gave opinion testimony as to the causative effect of lightning in the case. It is contended that neither of these witnesses had the proper qualifications to give opinion testimony as experts. Mr. Patterson was an electrical contractor of many years experience. Mr. Crowe had spent many years as a lineman

for the Blue Ridge Cooperative. We think that there was clearly no abuse of discretion on the part of the trial judge in concluding that both of these witnesses were qualified to express the opinions which they did. Mr. Crowe was one of two linemen who was called to investigate and restore service on the early morning of February 13, and in response to a question which was partly hypothetical, testifies that in his opinion lightning was the most probable cause of the power failure. Mr. Patterson who was called to do certain repair work at the Lesley chicken house testified that two of the fan motors were burned out. In answer to a question which was hypothetical in part, he testified in effect that in his opinion the cause of the failure of the motors was lightning.

In each instance counsel for appellant objected to the question "as being an improper hypothetical question without proper foundation." In neither instance did counsel point wherein he considered the hypothesis to be either inaccurate or incomplete. Counsel for appellant proceeded to cross examine Mr. Patterson without any reservation of his objection, and it is at least questionable whether there was any proper reservation of his objection in his cross examination of Mr. Crowe.

In any event, we are not convinced that there was any prejudicial error. In each instance, the question addressed to the witness assumed as a hypothesis the occurrence of a severe electrical storm, a fact not known to these witnesses, but proved by other witnesses. In all other respects, their opinions were predicated upon the scientific knowledge of the respective witnesses applied to the facts which they knew from observation in the course of their respective investigations.

Even if it be conceded that there was anything improper in the question addressed to the witness in either instance, appellant's general objection thereto was insufficient. Objections to hypothetical questions addressed to expert witnesses must be specific and point out

wherein the particular hypothetical question is improper. *Chapman v. Foremost Dairies, Inc.,* 249 S. C. 438, 154 S. E. (2d) 845.

We come now to a contention of the appellant which we deem meritorious. The plaintiff contended that the actual market value of the chickens was $1.38 each, and that he was, accordingly, entitled to recover the amount awarded by the jury. It is the appellant's contention that the policy expressly limited recovery for the loss of chickens of the particular age of the chickens here involved to $.8655 per bird, or the sum of $17,108.34. Appellant requested His Honor to so charge the jury, but His Honor deemed the policy ambiguous and submitted the issue to the jury, who returned the larger amount. The motion for a new trial *nisi,* which was denied, was predicated on the contention that the verdict should be reduced to what appellant contends was the policy limit of recovery, to wit: $17,108.34.

In his business, Mr. Lesley not only had laying hens but raised commercial layers for sale to others. The chickens involved in this case were purchased by him at approximately one day old, on or about November 10th, 1970, and were being raised under contract for sale to another as commercial layers at age 20 or 21 weeks, for $1.55 each. At the time of loss they were three months and three days or approximately twelve weeks old. The particular insurance policy issued by appellant afforded coverage according to a form attached thereto entitled "Chicken Growers Contract Breeder and/or Layer Form". In the first paragraph of such form there are certain boxes for the purpose of indicating what poulty is being insured and for what period of time, as follows:

☒ Pullets (day old to ~~20~~ 21 weeks)

☐ Started Pullets (20 weeks to 80 weeks)

☐ Layers (day old to 80 weeks)

☐ Breeders (day old to 60 weeks)

Aside from breeders with which we are not here concerned, it is obvious that the form was designed for use in affording insurance to those who raise pullets for sale as commercial layers; those who buy started pullets at 20 weeks of age for use as commercial layers; and those who wish to raise their own layers and insure them from a day old through 80 weeks. Apparently commercial layers are not regarded as being very productive beyond the age of 80 weeks. In this instance Mr. Taylor, on behalf of Mr. Lesley, applied for insurance on these day old chicks for a period of 21 weeks and, accordingly, the first box above shown was checked, with the numerals 20 being changed to 21.

Section 6(b) of the particular form is as follows:

"The liability of the Company as respects poultry shall not exceed the actual cash value at the time and place of loss as limited by the *loss recovery schedule herein*." (Emphasis added.)

Section 9 of the form is entitled "Schedule of Limits of Loss Recovery." The first half of said section 9 is clearly applicable solely to breeders with which we are not concerned. The last half of section 9 reads as follows:

"COMMERCIAL LAYERS
DATE OF HATCH THROUGH 18 MONTHS
SCHEDULE OF AMOUNTS RECOVERABLE
100% RECOVERY PER BIRD LIMITED TO $1.50

| LOSS RECOVERY MONTHS | % OF $1.50 | VALUE LIMIT | RECOVERY LIMIT | LOSS RECOVERY MONTHS | % OF $ . . . | LIMIT |
|---|---|---|---|---|---|---|
| 1 | 28% | | | 10 | 65% | |
| 2 | 41% | | | 11 | 61% | |
| 3 | 56% | | | 12 | 54% | |
| 4 | 73% | | | 13 | 47% | |
| 5 | 95% | | | 14 | 40% | |
| 6 | 100% | | | 15 | 33% | |
| 7 | 92% | | | 16 | 26% | |
| 8 | 84% | | | 17 | 19% | |
| 9 | 75% | | | 18 | 15% | |

His Honor declined to instruct the jury that appellant's liability was limited by the foregoing schedule, reasoning that there was an ambiguity in the policy

because Sec. 1, referred to the chickens insured as "pullets" while the clause above quoted was captioned "Commercial Layers." His reasoning, if correct, would indicate a patent ambiguity for resolution by the court, rather than a latent ambiguity for resolution by the jury. *Hann v. Carolina Casualty Ins. Co.*, 252 S. C. 518, 167 S. E. (2d) 420. When, however, all of the pertinent provisions of the policy are considered, we are convinced that there was no ambiguity, either patent or latent, but, to the contrary, such provisions were clear and unambiguous.

By the express terms of section 6, appellant's liability under the policy was limited to "the loss recovery schedule therein." The only completed "loss recovery schedule" contained in the policy is the above quoted one entitled "Commercial Layers". That schedule, we think, was designed, and clearly intended by the parties, to be applicable to commercial layers from "date of hatch through 18 months", and of necessity included those pullets under five months of age which were being raised as and for commercial layers but were not yet of laying age. His Honor was in error, we conclude, in failing to hold that liability of the appellant was limited in accordance with said loss recovery schedule.

Appellant's computation of the limit of its liability was arrived at as follows. The chickens were three months and three days old, hence liability was limited to 57.7% of $1.50, or $.8655 per bird or chicken. The accuracy of such computation is not challenged by the respondent who, on this point, simply contends that such loss recovery schedule is not applicable.

It is now settled, we think, that where damages improperly awarded can be segregated from those which were properly awarded, it is appropriate for this Court to affirm the judgment as to the damages properly awarded but reverse as to those improperly awarded. *Adcox v. American Home Assur. Co.*, 258 S. C. 331, 188 S. E. (2d) 785; *Black v. Jefferson Standard Life Ins. Co.*, 171

S. C. 123, 171 S. E. 617. See also cases collected in West's South Carolina Digest, Appeal and Error, Key No. 1140.

We conclude that the judgment below should be, and the same is hereby, affirmed to the extent of $17,108.34, together with interest thereon, but is reversed as to the excess which was improperly awarded.

Affirmed in part; reversed in part.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.