0697

Joyce S. HOWLE, Respondent v. PYA/MONARCH, INC. and Ray Gregory, Appellants.

(344 S. E. (2d) 157)

Court of Appeals

*James W. Alford,* of *Barnes, Alford, Stork & Johnson,* Columbia, *for appellants.*

*John W. Bledsoe, III,* of *Saleeby, Cox & Bledsoe,* Hartsville; *John Lindsay,* of *Lindsay & Lindsay,* Bennettsville, *for respondent.*

Heard Feb. 27, 1986.

Decided May 5, 1986.

GOOLSBY, Judge:

This is an action for negligence arising out of an automobile accident. In the trial court, the jury returned a verdict in favor of the respondent Joyce S. Howle in the amount of $200,000 actual damages. PYA/Monarch, Inc. (PYA) and Ray Gregory appeal. We affirm.

The questions on appeal concern the sufficiency of the evidence as to negligence, the admission of certain evidence from a consulting psychologist challenged as being incompetent, the admission of certain medical bills challenged as being irrelevant, the trial judge's ruling allowing Howle's counsel to cross-examine Gregory as to PYA's net worth, the closing argument made by Howle's counsel, the amount of the verdict, and the denial of PYA's and Gregory's motion for change of venue.

## I. Sufficiency of Evidence

PYA and Gregory argue that there was no probative evidence from which a jury could find Gregory negligent and

that it was therefore error for the trial judge to deny their motion for judgment notwithstanding the verdict.

In determining this question, we must review the evidence and all inferences reasonably deducible therefrom in the light most favorable to Howle, the nonmoving party. *Vacation Time of Hilton Head v. Lighthouse Realty*, 286 S. C. 261, 332 S. E. (2d) 781 (Ct. App. 1985). We must affirm if there is any evidence to sustain the factual findings implicit in the jury's verdict. *Id.*

On July 13, 1981, Howle and Gregory were involved in a head-on collision. Gregory's car travelled over the center line and hit Howle's car in her lane of traffic.

One eyewitness to the accident testified that immediately prior to the collision she observed Gregory's car approaching her from the opposite lane. Gregory's vehicle swerved off the road onto the shoulder, came back upon the highway over into her lane, and narrowly missed hitting the rear of her car.

Another eyewitness testified that she followed Gregory's automobile for eight or nine miles before the accident. She stated that Gregory drove erratically the entire time, weaving from one lane to the other.

Gregory suffers from brittle diabetes, a form of diabetes that is difficult to control. He went into a diabetic coma just before he collided with Howle's car.

PYA and Gregory admit that at the time of the accident Gregory was working within the scope of his employment as a route salesman for PYA.

On the day of the accident, Gregory called at the Tastee Freeze store on the highway where the accident occurred. B. B. Smith, the operator of the Tastee Freeze and a good friend of Gregory, testified that on this particular morning Gregory looked red in the face and seemed unusually quiet. It took so long for Gregory to work up Smith's order that Smith became concerned about him. At Smith's inquiry, however, Gregory said he was fine.

Gregory must take insulin each day and must eat three regular meals a day to maintain control over his diabetes. Although he took insulin and ate breakfast the day the

accident occurred, he did not eat lunch. His normal lunchtime was 11:30 a.m. The accident occurred shortly before noon.

The last thing Gregory remembers before the accident is pulling out from the Tastee Freeze. The accident occurred about eight or nine miles from the Tastee Freeze.

Gregory told the highway patrolman who investigated the accident that "he had gotten woozy and passed out."

Gregory has had diabetes for over thirty years and has experienced several hypoglycemic episodes when the sugar level in his blood decreased. According to one physician who testified at the trial, most diabetics realize when a hypoglycemic episode "is coming on."

The doctor further stated that "most diabetics carry some candy or sugar of some form in their pocket and will take it and this will relieve them." Gregory kept candy in his car, but he did not eat any prior to colliding with Howle.

Hypoglycemia causes Gregory to "get nervous" and "feel a little woozy." As Gregory futher described the condition's effect on him, "things would just kind of go dim and [he] couldn't see very good" and he would feel himself on the verge of passing out.

Sometimes Gregory has lost consciousness during a hypoglycemic episode without having any warning of its approach. In fact, Gregory claims he had no warning of the blackout he had on the day of the accident.

PYA and Gregory argue that they were not negligent because the accident was unavoidable since Gregory suffered a blackout just before the collision occurred. *See Collins v. Thomas,* 244 S. C. 128, 135 S. E. (2d) 754 (1964); *Tucker v. Reynolds,* 268 S. C. 330, 233 S. E. (2d) 402 (1977). Howle, on the other hand, contends the accident was avoidable because Gregory's blackout was forseeable and should have been guarded against. *See Lutzkovitz v. Murray,* 339 A. (2d) 64 (Del. 1975).

We agree with Howle.

■ A jury could reasonably find from the facts, as recited above, that PYA and Gregory were negligent because Gregory had sufficient warning on the morning of the accident that a hypoglycemic episode was approaching and,

though he had "gotten woozy" and knew he had not eaten lunch, he neither ate the candy he had available to abate the episode nor stopped driving.

## II. Admissibility of
## Psychologist's Testimony

PYA and Gregory next contend that it was error for the trial court to admit the testimony of Jan Edward Bixler, a consulting psychologist who examined Howle.

Bixler holds a Master's Degree in General Psychology and a Ph.D. Degree in Counseling Psychology from the University of Georgia. He served a one year postdoctorate fellowship at Texas Children's Hospital in Pediatric Psychology with an emphasis on psychological testing. Bixler taught in the Department of Psychology at Francis Marion College for a year and has been in the private practice of psychology for over nine years. He is licensed by the South Carolina State Board of Examiners in Psychology. For over eight years, Bixler has been certified by the State Department of Education as a School Psychologist III, the highest level of certification available. He is also a consulting psychologist to the South Carolina Vocational Rehabilitation Department, where he evaluates test results.

Bixler's practice is limited mainly to the administration of tests and the interpretation of test results. In evaluating patients with mental and emotional problems, Bixler relies on medical histories, information gained from family members, in-depth interviews with the patients themselves, and the results of a battery of tests.

Bixler administered to Howle the Minnesota Multiphasic Personality Inventory, a widely used psychological test. Based on the results of this test and interviews with Howle and her husband and daughter, Bixler concluded that Howle suffers from acute anxiety neurosis with depression and that the neurosis was caused by the accident. Bixler saw Howle again just prior to trial and acknowledged that her anxiety neurosis had improved, but he opined that the residual effects of the accident would remain with Howle for a long time.

## A.

PYA and Gregory argue that, because Bixler is a psychologist and not a medical doctor, Bixler was not qualified to give expert opinion testimony concerning his diagnosis and prognosis of Howle's mental and emotional condition and the causal relationship between the accident and Howle's mental and emotional problems. They base their argument on Section 40-47-40 of the Code of Laws of South Carolina (1976), which is included among the statutes regulating the practice of medicine, and Section 40-55-50 of the Code, which is included among the statutes regulating the practice of psychology.

Section 40-47-40 provides that one who "shall diagnose, cure, relieve in any degree or profess or attempt to diagnose, cure or relieve any human disease, ailment, defect, abnormality or complaint, whether of physical or mental origin ..." shall be regarded as practicing medicine.

Section 40-55-50 provides in part:

> A person practices as a psychologist within the meaning of this chapter when he:
>
>> (1) Holds himself out to be a psychologist or
>> (2) Renders to individuals or to the public for a fee, monetary or otherwise, any service involving the recognized principles, methods and procedures of the science and profession of psychology, such as: (a) assessment or measurement, through the use of psychological tests and interviews, of intelligence, aptitudes, skills, personality traits, behavior adjustment, attitudes and interests; ...

Generally the qualification of a witness as an expert is within the discretion of the trial judge. *Madden v. Cox*, 284 S. C. 574, 328 S. E. (2d) 108 (Ct. App. 1985). "To be competent as an expert, a witness must have acquired by reason of study or experience or both such knowledge and skill in a business, profession or science that he is better qualified than the jury to form an opinion on the particular subject of his testimony." *Botehlo v. Bycura*, 282 S. C. 578, 585-586, 320 S. E. (2d) 59, 64 (Ct. App. 1984).

The question of a nonmedical psychologist's qualification to give expert testimony on the issue of mental and emo-

tional condition has not been addressed in South Carolina. Courts in other jurisdictions have not treated the issue uniformly but the majority, more liberal approach appears to be in favor of allowing a psychologist to give expert testimony. As the Fourth Circuit Court of Appeals has stated:

> [T]he determination of a psychologist's competence to render an expert opinion based on his findings as to the presence or absence of mental disease or defect must depend upon the nature and extent of his knowledge; it does not depend upon his claim to the title of psychologist or psychiatrist.

*United States v. Riggleman,* 411 F. (2d) 1190, 1191 (4th Cir. 1969).

Psychologists have been allowed to give expert opinions as to mental and emotional condition, and often causation, in many different types of cases. *See Kravinsky v. Glover,* 263 Pa. Super. 8, 396 A. (2d) 1349 (1979) (psychologist's expert testimony admissible in automobile accident case as to diagnosis of plaintiff's "driving phobia" and its cause); *Reese v. Naylor,* 222 So. (2d) 487 (Fla. App. 1969) (automobile accident case where court allowed psychologist to testify as to plaintiff's mental condition; court recognized but did not decide the issue of whether the psychologist could testify as to causation); *Landreth v. Reed,* 570 S. W. (2d) 486 (Tex. Civ. App. 1978) (in an action involving wrongful death and infliction of emotional distress, clinical psychologist allowed to testify as to physical manifestations of emotional trauma); *In Interest of O'Neal,* 303 N. W. (2d) 414 (Iowa 1981) (in proceedings for termination of parental rights, psychologist qualified to express opinion based on interviews with the natural parents and results of tests administered to them as to their mental conditions); *People v. Noble,* 42 Ill. (2d) 425, 248 N. E. (2d) 96 (1969) (court held exclusion of testimony of psychologist who examined defendant and administered psychological tests to him was error in criminal case where defendant was pleading insanity); *In re Marriage of Auer,* 86 Ill. App. (3d) 84, 41 Ill. Dec. 536, 407 N. E. (2d) 1034 (1980) (psychologist's testimony admissible as to mother's mental condition in child custody case). *But see Spann v. Bees,* 23

Md. App. 313, 327 A. (2d) 801 (1974) (psychologist barred as a matter of law from giving expert testimony as to the presence or absence of mental disease or defect but may testify as to his judgment and interpretation of tests administered to a subject).

Section 40-47-40, which defines the term "practice of medicine," neither expressly nor implicitly bars a psychologist from testifying as to diagnosis, prognosis, and causation. A psychologist is not incompetent to give his opinion simply because he is not a licensed medical doctor. *See Daniels v. Bernard,* 270 S. C. 51, 240 S. E. (2d) 518 (1978); *Botehlo v. Bycura, supra.* At most, a psychologist's lack of a medical license affects his credibility and is a proper subject for cross-examination and for comment during jury argument. *Executive Car & Truck Leasing, Inc. v. DeSerio,* 468 So. (2d) 1027 (Fla. 4th Dist. Ct. App. 1985), *review denied* 480 So. (2d) 1293 (Fla. 1985).

Section 40-55-50, which defines the practice of psychology, likewise neither expressly nor implicitly bars a psychologist from giving testimony as to diagnosis, prognosis, and causation. Indeed, Section 40-55-60, another statute included among those that regulate the practice of psychology, contemplates that a psychologist may "diagnose, prescribe for, treat or advise a client with reference to complaints" embraced by psychological practice "as determined by the Board [of Examiners in Psychology]." Here, PYA and Gregory do not contend that Howle's complaint is one which the Board has determined is "outside the limits of psychological practice." Code of Laws of South Carolina § 40-55-60 (1976).

We therefore hold that a psychologist, once qualified as an expert witness by reason of education, training, and experience, is competent to testify as to diagnosis, prognosis, and causation of mental and emotional disturbance. *Simmons v. Mullen,* 231 Pa. Super. 199, 331 A. (2d) 892 (1974).

Here, Bixler's qualifications as a psychologist are not disputed by PYA and Gregory.

Accordingly, the trial court committed no error in ■ allowing Bixler to testify as to Howle's present and future mental and emotional condition and as to what caused her mental and emotional problems.

## B.

PYA and Gregory further assert that the trial court erred in allowing Bixler's opinion testimony because it was based in part on information he had gathered from Howle and from her family members and thus was founded on inadmissible hearsay. We disagree.

Although, generally speaking, it is true that where an expert does not of his own knowledge know the facts upon which his opinion is based he cannot give his opinion except in response to a hypothetical question, *State v. King*, 158 S. C. 251, 155 S. E. 409 (1930), we think this rule has been limited in situations such as this by *Gentry v. Watkins-Carolina Trucking Co.*, 249 S. C. 316, 154 S. E. (2d) 112 (1967). In *Gentry*, the Supreme Court held that where a physician is consulted solely as a prospective witness, the physician's testimony as to the patient's statements about his present condition and past symptoms is not admissible as substantive proof of the facts so stated but is admissible as "information upon which he has relied in reaching his professional opinions." 249 S. C. at 324, 154 S. E. (2d) at 117.

We recognize that *Gentry* dealt with statements made by a patient to a physician; however, we see no practical reason why the logic of *Gentry* cannot be extended to a situation where, as here, an examining psychologist relied in part on information received from the patient and the patient's family.

The trend today, which we choose to follow, is toward allowing expert opinion testimony to be based partially on information received from others, even though the information itself may not be admissible, if such facts and data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." FED.R.EVID. 703; *see also Booker v. Duke Medical Center*, 297 N. C. 458, 256 S. E. (2d) 189 (1979); *Ballenger v. Burris Industries, Inc.*, 66 N. C. App. 556, 311 S. E. (2d) 881 (1984), *review denied*, 310 N. C. 743, 315 S. E. (2d) 700 (1984); *State v. Henderson*, 159 Ind. App. 621, 308 N. E. (2d) 710 (1974).

In this case, the information Bixler received from Howle and her family members was not being offered for the truth of the matters asserted therein; rather, it was merely mentioned as one of the bases of Bixler's

diagnosis. Bixler testified that he usually relied upon such information in making diagnoses and treating patients. The reliability of this information was more properly a matter for cross-examination by PYA and Gregory.

### III. Admissibility of Evidence Concerning Subsequent Treatments

PYA and Gregory next assert error in the admission of Howle's testimony as to medical bills for treatment by an eye doctor who prescribed corrective lenses for Howle and for a hospitalization and treatment for emotional problems. Both the eye treatment and the hospitalization and treatment for emotional problems occurred sometime after the accident. The bills therefor were introduced during Howle's testimony over objection of defense counsel. Neither the eye doctor nor the physican who treated her while she was hospitalized testified.

PYA and Gregory argue that Howle did not sufficiently establish a causal connection between the accident and her treatment for eye problems and the accident and her hospitalization and treatment for emotional problems.

It is clear that expert medical testimony is not required in every case to establish a causal connection between an accident and subsequent injury or treatment. *See Ballenger v. Southern Worsted Corporation,* 209 S. C. 463, 40 S. E. (2d) 681 (1946). If the facts and circumstances proved give rise to a reasonable inference of a causal connection between a plaintiff's present condition and the earlier accident, the absence of medical testimony need not be conclusive. *See Gambrell v. Burleson,* 252 S. C. 98, 165 S. E. (2d) 622 (1969); *Grice v. Dickerson, Inc.,* 241 S. C. 225, 127 S. E. (2d) 722 (1962).

In *Ballenger, supra,* the testimony of a worker and his wife that he had no vision problems before an industrial accident in which a kettle of hot dye erupted over his face and that he suffered an astigmatism and impaired vision after the accident was found by the Supreme Court to be sufficient despite contrary medical evidence. The Court noted "the fallacy of arguing from mere temporal sequence to cause and effect relationship," *i.e,* because the injury

occurred after the accident, it must have been caused by the accident. 209 S. C. at 466, 40 S. E. (2d) at 682. The Supreme Court found that the testimony of the claimant and his wife established more than just temporal sequence.

In this case, Howle testified that before the accident she had no vision problems but did so afterward and that her vision problems necessitated treatment from an eye doctor and corrective lenses. Other evidence revealed that she received extensive head and facial injuries in the accident and that her eyelid itself was lacerated.

As to Howle's hospitalization and treatment for emotional problems, Howle testified that before the accident she had never been hospitalized for nervousness or for any similar condition and that her health had been good. The orthopedic surgeon who treated Howle noted that she was very depressed two and a half weeks after the accident. The consulting psychologist who examined Howle stated that Howle "broke down and cried on [several] occasions" when she talked about the accident. He further noted that the residual effects of the accident would remain with Howle for a long time.

Although the evidence as to causal connection between the accident and treatment for vision problems and between the accident and treatment and hospitalization for emotional problems is, admittedly, somewhat scant and not totally satisfactory, it does show more than "mere temporal sequence." Howle, it is true, could have introduced the testimony of the doctors who treated her to better establish the causal connection. Still, we think the deduction that the accident caused Howle's later vision and emotional problems is consonant with common sense and reason.

The trial court did not err, then, in admitting the testimony as to the disputed medical bills.

## IV. Cross-examination

PYA and Gregory next assert the trial court erred in permitting Howle's attorney to cross-examine Gregory as to PYA's net worth and in permitting counsel to suggest a figure representing PYA's net worth. We find no error.

During cross-examination of Gregory, following numerous objections and an in camera discussion, the following colloquy occurred:

Q: Do you know approximately how much net profit [PYA] made [last year]?

A: No, sir, I don't.

Q: Mr. Gregory, if I indicated to you that they made one hundred and forty million—

MR. ALFORD: If Your Honor please—

Q: —dollars, would you think that would be—

\* \* \*

MR. ALFORD: That becomes Mr. Lindsay's testimony and I object and I move that the jury be instructed to disregard the question.

THE COURT: I think he can cross-examine him on it. Go ahead.

Q: Mr. Gregory, all I'm asking you, you say you don't know exactly how much they make, they make a lot of money don't they?

A: Yes, sir.

\* \* \*

PYA and Gregory admit that evidence of a corporate defendant's net worth is admissible where the plaintiff is seeking punitive damages. *Rogers v. Florence Printing Company*, 233 S. C. 567, 106 S. E. (2d) 258 (1958). What they object to is Howle's counsel suggesting a figure after Gregory had already stated that he did not know the financial worth of PYA.

The manner and extent of cross-examination is within the broad discretion of the trial judge. *North Greenville College v. Sherman Construction Co., Inc.*, 270 S. C. 553, 243 S. E. (2d) 441 (1978). "It is established that counsel cannot, even on cross-examination, ask groundless questions for the purpose and with the result of prejudicing a party (who is testifying) by the nature of the questions." *Shockley v. Cox Circus Co.*, 204 S. C. 353, 362, 29 S. E. (2d) 491, 494 (1944). This rule, however, must be harmonized with the broad discretion which the trial judge is allowed. The trial judge's

discretion must be exercised so "that the trial will be fair and its result unaffected by prejudice." *Id.*

Although we do not necessarily approve of the ■ method used by Howle's counsel in this instance, we cannot find as a matter of law that the trial judge abused his discretion in allowing the cross-examination. *See Entzminger v. Seigler,* 186 S. C. 194, 195 S. E. 244 (1938) (no misconduct in asking a question whose propriety is merely doubtful).

Further, there is no evidence that PYA and Gregory were prejudiced by the question. The evidence of net worth was being offered for the jury's consideration of punitive damages. Here, no punitive damages were awarded to Howle. *See Powers v. Temple,* 250 S. C. 149, 156 S. E. (2d) 759 (1967) (error in admission of testimony on the issue of damages is harmless unless the error prejudices the jury on the issue of liability).

## V. Counsel's Closing Argument

PYA and Gregory's next exception asserts error on the part of the trial judge in permitting Howle's counsel to argue certain matters to the jury. Specifically, they object to the failure of the trial judge to instruct the jury to disregard an argument on an element of damages that had been stricken from the complaint and to what they perceive to be an argument by counsel in which he "suggest[ed] to the jury his own opinions and speculative calculations of damages."

### A.

It has long been settled that closing arguments and objections thereto are left largely to the sound discretion of the trial judge "who is on the scene and in much better position than an appellate court to judge as to what is improper argument under the circumstances." *Lesley v. American Security Insurance Company,* 261 S. C. 178, 185, 199 S. E. (2d) 82, 85-86 (1973).

Howle's counsel during his jury argument discussed Howle's loss of earnings up to age 65, though she had a life expectancy of 78 years. The trial judge later struck from the allegation of the complaint relating to loss of earnings the words "the balance of her life." PYA and Gregory argue that

the trial judge at that point should have instructed the jury to disregard the argument by Howle's counsel regarding loss of future earnings.

We find no abuse of discretion in the ruling of the ■ trial judge. As amended, this portion of the complaint as it went to the jury alleged: "[Howle] was gainfully employed with Burlington Industries and she sustained a loss of earnings and will sustain a loss of earnings." Thus, Howle was not precluded from asserting a future loss of earnings, only that this loss would continue for the balance of her life.

### B.

PYA and Gregory further assert that the argument ■ by Howle's counsel as to damages for pain and suffering was improper and prejudicial because he suggested his own opinion to the jury as to what those damages should be. We find no error.

Howle's counsel during his closing argument used a blackboard to illustrate damages. He put certain figures on the board to represent the different elements of damages claimed by Howle, including a per diem calculation for pain and suffering. At the end, counsel added up all the figures, coming up with a total of $195,767. The verdict, as we noted previously, was $200,000.

PYA and Gregory argue that the fact that actual verdict was so close to that suggested by Howle's counsel shows that counsel's opinion was improperly substituted for the jury's opinion and that the argument was therefore prejudicial.

Throughout his argument, however, Howle's counsel repeatedly told the jury that he could not suggest a figure for pain and suffering and he stressed that any amount awarded Howle for pain and suffering was for the jury alone to determine.

The type of argument made by counsel in this case was specifically approved by the South Carolina Supreme Court in *Edwards v. Lawton*, 244 S. C. 276, 136 S. E. (2d) 708 (1964). Here, as in *Edwards*, there was much testimony in the record as to Howle's pain and suffering and counsel carefully avoided giving his opinion as to the value of these damages.

We find no error in either counsel's argument or his use of the per diem formula. *See also Indemnity Insurance Company of North America v. Odom*, 237 S. C. 167, 116 S. E. (2d) 22 (1960) (no error for counsel to put figures for lost wages on blackboard during closing argument where the figures are not "wholly unsupported by the evidence").

## VI. Verdict

PYA and Gregory next assert the trial judge erred in denying their motion for a new trial on the ground that the verdict of $200,000 is so excessive as to shock the conscience of the court.

On appeal, this court presumes the jury awarded an amount of damages within its discretion and it views all the evidence and the inferences reasonably deducible therefrom in the light most favorable to sustaining the verdict. *Crittenden v. Thompson-Walker, Inc.*, 341 S. E. (2d) 385 (S. C. Ct. App. 1986). Where the amount of a verdict bears a reasonable relationship to the character and extent of the injury sustained, it is not excessive. *King v. Daniel International Corp.*, 278 S. C. 350, 355, 296 S. E. (2d) 335, 338 (1982). Mere undue liberality provides no basis for this court's overturning of a jury verdict. Only where the verdict is so excessive as to indicate it was obviously the result of caprice, passion, or prejudice may the verdict be disturbed on appeal. *Gasque v. Heublein, Inc.*, 281 S. C. 278, 315 S. E. (2d) 556 (Ct. App. 1984).

In this case, Howle was seriously injured in the accident. She suffered severe lacerations of the head, face, arms, and legs and was left permanently scarred. She has already undergone scar revision surgery once and more surgery is needed in the future. This surgery will only improve the appearance of Howle's scars, not eliminate them entirely. Howle also suffered an open fracture of her right kneecap and a broken left ankle. Following the accident, Howle spent eleven days in the hospital and over five weeks with casts on both legs. She is unable to return to her former job and has some permanent disability in her legs. Howle also has experienced and will continue to experience emotional distress as a result of the accident. Her medical bills, exclusive of the

additional surgery which she needs, and her lost wages totalled over $8,000.

Although this verdict may be large, it is well within the discretion of the jury, given the injuries and damages suffered and proved by Howle. We see nothing in the record that leads us to conclude that the jury was guided by anything other than a desire to compensate Howle fully for her serious personal injuries and resulting damages. Indeed, the jury's refusal to award punitive damages strongly suggests that the jury was motivated by no other consideration. *Crittenden v. Thompson-Walker, Inc., supra.*

## VII. Motion for Change of Venue

PYA and Gregory, a Florence County resident, also appeal from the denial of their motion for a change of venue on the basis that PYA was not a resident of Marlboro County. The hearing judge denied the motion, expressly finding that a deposition showed PYA owned property and transacted business in Marlboro County.

The burden is on the appellant to provide an adequate record for appellate review *Germain v. Nichol,* 278 S. C. 508, 299 S. E. (2d) 335 (1983).

Here, the record on appeal, as it relates to the change of venue motion, contains only the motion itself and the hearing judge's order. Neither the deposition nor the part thereof on which the hearing judge based his decision is anywhere identified in the record itself.

The only deposition set forth in the record was that given by Gregory and it is printed only in excerpt form. The printed portions of his deposition nowhere show that PYA does not own property and does not transact business in Marlboro County, the county in which the trial occurred.

Because of PYA's and Gregory's failure to provide us with an adequate record of the evidence upon which the hearing judge based his decision, we are unable to review the correctness of the order denying the motion to change venue and, therefore, decline to address the question raised about it. *Teitelbaum v. Reliable Welding Co.,* 106 Ill. App. (3d) 651, 62 Ill. Dec. 54, 435 N. E. (2d) 852 (1982); 4A C.J.S. *Appeal & Error* § 1162 at 1258 (1957).

Accordingly, the judgment below is

Affirmed.

CURETON, J., and LITTLEJOHN, Acting Judge, concur.