Argued and submitted April 19, 1995; resubmitted In Banc June 12, reversed and remanded August 28, petition for review denied December 17, 1996 (324 Or 487)

·Joanne Kay CUNNINGHAM,
*Appellant,*

*v.*

Mark W. MONTGOMERY, D.M.D.,
*Respondent.*

(92C-10877; CA A82542)

921 P2d 1355

[redacted]

In Banc

[redacted]

Clayton C. Patrick argued the cause for appellant. With him on the reply brief was Patrick & Meadowbrook.

Thomas M. Christ argued the cause for respondent. With him on the brief was Mitchell, Lang & Smith.

EDMONDS, J.

Armstrong, J., dissenting.

**EDMONDS, J.**

Plaintiff appeals from a jury verdict for defendant in this medical malpractice action. Because the trial court erred when it refused to allow plaintiff's expert witness to testify as to her opinion about the medical causation of plaintiff's condition, we reverse.

In 1991, defendant, a dentist, treated plaintiff for a toothache. He used nitrous oxide to relieve plaintiff's pain and to help her relax while he worked on her teeth. Plaintiff testified that, as she began breathing the gas, she felt as though she were "being sucked into a black hole." According to plaintiff, she blacked out at that point and remembered nothing until she awoke after the procedure.

Plaintiff returned to her employment on the day of the procedure but felt ill. She testified that she was woozy, had a headache, suffered from nausea and that her eyesight became blurred. She began to experience flashes of light and black spots floating across her vision. Her symptoms continued over a period of several days. Eventually, the flashes of light, black spots and headache went away but plaintiff's vision remained impaired, requiring her to obtain a new prescription for her glasses.

After the procedure, plaintiff also testified that she developed cognitive problems. She was able to proofread as she was typing before the injury but afterwards, she could not perform that function. Her family and friends told her that she was repeating herself, that her memory seemed to be a problem and that she would tell someone the same thing several times in the span of two or three hours. At work, she was having spelling problems. When she would use the dictionary to look up the spelling of a word, she could not remember the word for which she was looking. She testified that when she would try to say something, the wrong words would come out. Also, she could not remember the correct word when she would go to the store to buy an item. Eventually, plaintiff underwent neurological testing at Oregon Health Sciences University (OHSU) and received therapy concerning her memory lapses.

In 1992, plaintiff filed this action against defendant, alleging that he had negligently used equipment that contained an oxygen leak when he administered the nitrous oxide; that he had failed to warn plaintiff of the known risks of using nitrous oxide; that he had failed to have the equipment routinely tested for oxygen leaks; and that he had failed to properly monitor plaintiff for signs of harm caused by the nitrous oxide. At trial, defendant argued that plaintiff did not suffer from any cognitive deficits and that during the treatment she had not suffered hypoxia[1] when the nitrous oxide was administered. The jury found in favor of defendant.

Plaintiff's first assignment of error states:

"The trial court erred when it refused to allow the plaintiff's expert Dr. Wong-Ngan to testify, but nevertheless allowed defendant's expert Matarazzo to testify:

"[DURING EXAMINATION OF PLAINTIFF'S EXPERT:]

" 'MR. DAVIS: I object, your honor. And if I may ask a question in aid of objection?

" 'THE COURT: You may.

" 'MR. DAVIS: Dr. Wong, do you have any medical background?

" 'THE WITNESS: I work in a medical setting.

" 'MR. DAVIS: You are not a doctor?

" 'THE WITNESS: I am a Ph.D.

" 'MR. DAVIS: You are not a physician, though?

" 'THE WITNESS: *I am not a medical physician.*

" 'MR. DAVIS: Thank you. Your honor, *I would object to any testimony on a medical condition.*'

" 'THE COURT: Sustained.[2]

---

[1] "Hypoxia" or "anoxia" refers to a decreased amount of oxygen in organs and tissues. Anoxic encephalopathy connotes an injury or disease to the brain caused by oxygen deprivation. *Stedman's Medical Dictionary* 99, 522 (2d unabridged Lawyers' ed 1966).

[2] The dissent states, "The court implicitly construed her testimony to mean that she was qualified only to identify mental impairments[,]" 143 Or App at 184, and that our conclusion that the trial court's ruling was based on the erroneous premise that only medical doctors were qualified to render opinions on medical

"* * * * *

"[DURING EXAMINATION OF DEFENDANT'S EXPERT:]

" 'MR. NELSON:   Object to that question on the basis that there is insufficient foundation for it. *She is not a medical doctor, your Honor.*

" 'MR. DAVIS:   Haven't asked for a medical opinion. I've asked for an opinion in her area of expertise.

" 'THE   COURT:   Objection   overruled.   You   may answer.' " (Emphasis supplied.)

Although the language of the assignment of error is somewhat inartful, its import is clear. In plaintiff's case-in-chief, she called Dr. Julia Wong-Ngan as a witness. Wong-Ngan is a neuropsychologist who has a private practice in Portland and is on the medical staff of the OHSU and the Veterans' Administration Hospital. She has a doctoral degree in clinical psychology and a fellowship in neuropsychology. A neuropsychologist is a specialist in the area of clinical psychology, a discipline which focuses on the brain and behavioral relationships of individuals who have brain impairment due to dementia, head injury or other kinds of brain disease.

When plaintiff went to OHSU's neurological clinic for testing, she was evaluated by Wong-Ngan. Wong-Ngan performed a battery of cognitive tests including intelligence tests, memory tests, tests for concentration and attention, tests for verbal skills and for visual perceptual abilities. Wong-Ngan found that plaintiff had normal mental functioning in all areas except memory and described those deficits as in the moderate to severe range. She also believed that plaintiff's visual memory appeared to be particularly impaired.

At trial, Wong-Ngan testified as to her findings and was then asked by plaintiff's counsel:

"Based upon the testing that you did and the history that you took, did you form a preliminary impression in this particular case?"

---

causation "is based on speculation." 143 Or App at 185. The record does not support those assertions. The only subject of the objections before the trial court and the ruling by the trial court about Wong Ngan's qualifications to render an opinion are expressed by the above colloquy.

Wong-Ngan replied:

> "Yes. My impression was that her findings were consistent with an anoxic encephalopathy."

At that point, defendant moved to strike the answer, "because a proper foundation has not been laid." The trial court granted the motion. After a series of questions, Wong-Ngan was asked by plaintiff's counsel:

> "And as of May 1, 1992, and at the time you generated [a] report, had you formed an opinion based upon a reasonable psychological probability based upon the information available to you and the scientific data of your profession as to her condition as it related to memory?"

Wong-Ngan replied, "Yes. I gave a diagnosis of anoxic encephalopathy." Again, defendant moved to strike the answer on the basis of a lack of proper foundation, and the court struck the answer. Plaintiff's counsel rephrased the question in terms of "a reasonable medical certainty or psychological certainty." Defense counsel again objected, arguing that because Wong Ngan was not a medical doctor, she could not testify to medical causation.

After that exchange, plaintiff's counsel established that Wong-Ngan works with and had training in treating patients who have suffered from hypoxia, that neuropsychologists are often called upon to consult, test and diagnose conditions of impaired memory or other mental functions that result from hypoxia, that Wong Ngan routinely treats patients who have brain impairments of other natures and renders diagnoses as to whether they have an impairment and what the impairments are, and that medical doctors typically refer patients with cognitive impairments to neuropsychologists for those purposes. Thereafter, Wong-Ngan was again asked her opinion about the cause of plaintiff's memory deficits, and the court sustained the objection on the basis that Wong-Ngan was not a medical doctor.

■■ The issue raised by plaintiff's assignment of error is whether Wong-Ngan was qualified to testify to the medical

causation of plaintiff's condition under OEC 702.[3] " 'The determination of an expert's qualifications is a preliminary question of fact for the trial judge under [OEC] 104(1).' " *Dyer v. R. E. Christiansen Trucking, Inc.*, 318 Or 391, 398, 868 P2d 1325 (1994) (quoting L. Kirkpatrick, Oregon Evidence 433 (2d ed 1989)). A trial court determines the admissibility of the expert's opinion in part by deciding whether the qualifications of the witness have been established by a preponderance of the evidence. *See State v. Carlson*, 311 Or 201, 209, 808 P2d 1002 (1991) (holding that the preponderance standard applies in deciding preliminary questions of fact under OEC 104(1)). We review for whether there was sufficient evidence to support the trial court's determination that plaintiff's expert was not qualified to testify to the medical cause of plaintiff's condition. We accept all reasonable inferences and reasonable credibility choices that the trial judge could have made. *Carlson*, 311 Or at 214.[4]

■ In this case, the trial court refused to admit Wong-Ngan's testimony as to medical causation solely because Wong-Ngan was not a medical doctor. Outside of that one fact, the clear weight of the evidence tended to prove that Wong-Ngan was qualified to testify about the causation of plaintiff's condition. OEC 702 reflects the view that an expert witness on a medical subject need not be a person licensed to practice medicine. The rule is patterned after federal rule 702, which is a codification of federal case law. 3 Jack B. Weinstein, *Evidence* ¶ 701[01] (1995).

Wigmore states about the case law:

"The common law * * * does not require that the expert witness on a medical subject shall be a person duly *licensed to practice medicine* * * *. Except as an indirect stimulus to

---

[3] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[4] It is not clear from the record that the parties and the trial court recognized that the issue of Wong-Ngan's qualifications presented a preliminary question of fact under OEC 104(1). The rule contemplates a hearing or request in which each side may produce evidence. It could be that the court was operating under the pre-OEC 104(1) method of deciding the issue.

obtain a license, such a rule is ill-advised; first, because the line between chemistry, biology and medicine is too indefinite to admit of a practicable separation of topics and witnesses and second, because some of the most capable investigators have probably not needed or cared to obtain a license to practice medicine." 2 John Henry Wigmore, *Evidence* § 569 (J. Chadbourn rev 1979). (Emphasis in original.)

Similarly, the Oregon Supreme Court generalized in *Creasey v. Hogan*, 292 Or 154, 156, 637 P2d 114 (1981):

"Where the principles, techniques, methods, practices or procedures of one branch of the healing arts concur or are generally the same as those of another branch of the healing arts, in a malpractice case against a practitioner in one branch, opinion evidence on a point concerning such matters from a practitioner in another branch is admissible."

On at least two occasions, the Oregon Supreme Court has considered issues that are analogous to this case. In *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 449 P2d 426 (1969), the trial court refused to admit the testimony of a clinical psychologist that an injury to the plaintiff's head caused the plaintiff's injury, because the psychologist was not medically trained and, therefore, was not qualified to render an opinion regarding the cause of the injury. The plaintiff testified that he had suffered from blackouts, dizziness and suicidal feelings after suffering a superficial cut to his forehead. The trial court took the consideration of his complaints from the jury because, without the testimony of the psychologist, there was no evidence that they were caused by the injury to the plaintiff's head.

The Supreme Court reversed the trial court's ruling. It noted that one of the functions of a clinical psychologist was to differentiate between organic and functional disorders. The court concluded:

"The majority of the available case law indicates that a properly-qualified clinical psychologist is competent to testify concerning a person's mental and emotional condition despite his not having medical training. Though we find no cases which hold that psychologists are competent to testify

as to the causitive [sic] factors of a given mental or emotional condition, the accepted literature in the field of psychology states that such factors are within their expertise.

"We hold that clinical psychology has become established and recognized as a profession whose members possess special expertise in the field of mental and emotional disorders and that a psychologist who is a diplomate in clinical psychology of the American Board of Examiners in Professional Psychology, who is a member of the American Psychological Association and who is licensed to practice psychology in Oregon is qualified to express an opinion such as the one offered by the witness in question. The law does not require that in order to qualify as an expert, the witness be better qualified than anyone else. It only requires that he have sufficient expertise to make it probable that he will aid the jury in its search for the truth." *Id*. at 384.

In *Barrett v. Coast Range Plywood*, 294 Or 641, 661 P2d 926 (1983), the Supreme Court held that the Workers' Compensation Board erred when it refused to consider the testimony of medical doctors regarding the claimant's functional overlay.[5] The Board based its ruling on the fact that the medical doctors testifying in the case were not psychologists or psychiatrists. The court reversed, reciting the general proposition that the field of specialization of a competent medical witness affects the *weight* to be given to the testimony, not its *admissibility*. Citing OEC 702, the court ruled that, because the diagnosis of functional overlay is within the competency of medical doctors, they may express expert opinions about that subject, and the fact that they are not psychologists does not prevent them from testifying to the causal relationship between a work-related incident and the claimant's injury.

We conclude that the same analysis applies here. Neuropsychology is a discipline based on specialized knowledge and experience not common to the average understanding of the public. According to the testimony, it is a specialty of clinical psychology and focuses on the relationships between brain impairment and the behavior of individuals

---

[5] "'Functional overlay' * * * is an ailment in addition to an already existing condition which is not caused by a structural defect." *Barrett*, 294 Or at 644.

"due to dementia or head injury or other kinds of brain disease." Wong-Ngan's testimony was unequivocal that hypoxia is a potential cause of cognitive deficits and that neuropsychologists routinely diagnose and treat all kinds of cognitive impairments, including those caused by hypoxia. Moreover, there is no evidence that Wong-Ngan is not a qualified neuropsychologist or that neuropsychologists are not qualified to render opinions on medical issues involving cognitive deficits. Although Wong-Ngan is not board certified, she testified that she has specialized training in the diagnosis and treatment of patients suffering impairment resulting from hypoxia and is on the staff of two hospitals. Regarding plaintiff, she testified, "My impression was that [plaintiff's] findings were consistent with anoxic encephalopathy." Thus, based on her specialized training and experience with patients suffering from hypoxia, she reached an opinion as to the causation of plaintiff's symptoms. That opinion is the kind of opinion relied on by medical doctors who refer patients to her for the purpose of determining the origin of symptoms like those of plaintiff. Because the trial court's ruling was not based on a proper analysis under OEC 702 but on the erroneous premise that only medical doctors are qualified to render an expert opinion on the causation of cognitive deficits, a premise not supported by the evidence, its ruling was error.

Second, defendant argues that even if the trial judge erred, plaintiff did not suffer any prejudice from the trial court's ruling. Plaintiff counters that she was prejudiced when the trial court allowed defendant's expert to testify, but not her expert. In his case-in-chief, defendant called Dr. Ruth Matarazzo as an expert witness. She is a clinical psychologist and a professor at OHSU, and is a diplomate in clinical psychology and clinical neuropsychology. She also had examined plaintiff and reviewed the medical reports that had been generated concerning plaintiff's condition. She was asked by defendant's counsel whether plaintiff "has any convincing evidence of organically-based cognitive deficits?" Plaintiff objected on the basis that Matarazzo was not a medical doctor. The trial court overruled plaintiff's objection, and Matarazzo testified that there was no objective evidence regarding memory loss and that psychological or emotional factors

affected her test performances. She also criticized Wong-Ngan's evaluation in a number of areas and testified that Wong-Ngan's testing was not complete and was deficient.

Defendant argues that Matarazzo's testimony was different from Wong-Ngan's because Matarazzo did not testify as to causation but only that plaintiff had not suffered any deficits. He adds that plaintiff offered evidence that there were no other potential causes that would account for the putative deficits and that, at the time of the objection, plaintiff already had elicited from another expert medical witness that the deficits were caused by hypoxia. Plaintiff counters that the prejudice arising from the trial court's first ruling was exacerbated when the trial court permitted Matarazzo to give an opinion on a subject that the court had refused to allow Wong-Ngan to testify about. Plaintiff concludes, "Since the experts have the same qualifications, this most certainly * * * gave the jury the impression that the defendant had the better and more believable expert, who should be believed over the plaintiff's expert."

■ ■ Evidentiary error is not presumed, OEC 103(1). Nonetheless, prejudicial error occurs if the excluded evidence has some likelihood of affecting the jury's result. *Hass v. Port of Portland*, 112 Or App 308, 314, 829 P2d 1008, *rev den* 314 Or 391 (1992). The issues of whether plaintiff had suffered cognitive deficits and whether hypoxia had caused those deficits were closely intertwined. Not only did Matarazzo testify that plaintiff did not suffer from any deficits, but she also testified about her criticisms of Wong-Ngan's evaluation. In effect, the combination of rulings by the trial court could have implied to the jury that it should not believe Wong-Ngan about the existence of the deficits because the court had ruled that she was not a competent witness to testify as to their causation. At least, that is a reasonable inference that the jury could draw from the court's ruling and presents a likelihood of affecting its result. We conclude that plaintiff is entitled to a new trial for this reason.

Plaintiff also makes two other assignments of error concerning the failure to give a *res ipsa loquitur* jury instruction requested by plaintiff and in refusing to allow plaintiff an opportunity to produce evidence about whether the

machine used by defendant was defective. It is not clear that these issues will arise on retrial. Therefore, we decline to address them.

Reversed and remanded.

**ARMSTRONG, J.,** dissenting.

Because I believe the majority engages in a reweighing of the evidence, which is contrary to our function on appeal, I respectfully dissent.

The majority states our standard of review to be that we

> "review for whether there was sufficient evidence to support the trial court's determination that plaintiff's expert was not qualified to testify to the medical cause of plaintiff's condition. We accept all reasonable inferences and reasonable credibility choices that the trial judge could have made."

143 Or App at 177. Rather than doing that, however, the majority reconsiders the evidence and draws its own conclusion about the expert's qualifications. The majority errs in doing that.

The majority claims that

> "the trial court refused to admit Wong-Ngan's testimony as to medical causation solely because Wong-Ngan was not a medical doctor. Outside of that one fact, the clear weight of the evidence tended to prove that Wong-Ngan was qualified to testify about the causation of plaintiff's condition."

143 Or App at 177. I disagree with that assessment of the evidence. The trial court determined that plaintiff had failed to establish that Wong-Ngan was qualified to offer an opinion on *the medical cause of plaintiff's impairment*. I believe that there is evidence in the record to support that finding.

> "The determination of whether a witness is qualified to testify as an expert is within the discretion of the trial court and will not be overturned except for an abuse of discretion."

*State v. Caulder*, 75 Or App 457, 460, 706 P2d 1007, *rev den* 300 Or 451 (1985). An expert qualified to express an opinion

on one subject may not be qualified to express an opinion on a related subject. *See, e.g., State Dept. of Trans. v. Montgomery Ward Dev.*, 79 Or App 457, 465, 719 P2d 507, *rev den* 301 Or 667 (1986).

Wong-Ngan testified that she was a neuropsychologist, which is a specialist who focuses on the mental and behavioral characteristics of individuals who have brain impairment due to dementia, other brain disease, or head injury. She testified that she had performed a battery of clinical tests on plaintiff to measure her intelligence, memory, concentration and attention, verbal skills and visual perceptual skills. Wong-Ngan stated that the tests that she had administered *were designed to reveal whether plaintiff had a deficit* in any of those areas.[1] Wong-Ngan found that plaintiff scored poorly on several memory tests, and concluded that she was particularly impaired in the area of visual memory.

Wong-Ngan repeatedly attempted to testify that she had diagnosed plaintiff's condition as being *caused* by hypoxia, specifically anoxic encephalopathy. Defendant objected, and the trial court sustained the objection. Defendant's objection was that plaintiff had failed to lay the proper foundation to show that Wong-Ngan had the training and experience to make a medical diagnosis about the cause of plaintiff's memory problems.

Wong-Ngan testified that, as a neuropsychologist, she was qualified to diagnose whether a person suffers from impaired memory or other impaired mental functions that could be caused by hypoxia or other injuries:

"Q. Let me ask you this: Do you work around and with patients and have you had training in patients that have suffered conditions and impairments as a result of hypoxia?

"A. Yes.

"Q. And neuropsychologists, are they often called upon to consult and test, to diagnose conditions of impaired memory or other mental function in terms of memory or other results of hypoxia?

---

[1] None of the tests Wong-Ngan administered was designed to detect the cause of the deficits or to distinguish whether the deficits had an organic or psychological origin.

"A. Yes.

"Q. And do you routinely work with patients [who] have brain impairments of other nature?

"A. Yes.

"Q. And you routinely render a diagnosis in those fields as to whether or not they have an impairment and what the impairment is?

"A. Yes.

"Q. In fact, isn't it true that medical doctors usually refer patients with these types of impairments to neuro-psychologists for diagnosis?

"A. Yes."

Wong-Ngan was allowed to give her opinion about whether plaintiff had impaired memory. The issue, however, is whether the record establishes that Wong-Ngan was qualified to diagnose the cause of that impairment, that is, whether plaintiff had suffered an hypoxic episode.

The word "diagnose" can mean either of two things: (1) "to identify (as a disease or condition) by symptoms or distinguishing characteristics" or (2) "to determine the causes of or the nature of by diagnosis." *Webster's Third International Dictionary* 622 (1971). The court could rationally have understood Wong-Ngan's testimony to mean that she was qualified to identify impairments or that she was qualified to diagnose the cause of those impairments or both.

The court implicitly construed her testimony to mean that she was qualified only to identify mental impairments. In other words, assuming that plaintiff had been diagnosed as having suffered hypoxia, Wong-Ngan was qualified to test plaintiff's mental abilities and express an opinion about whether plaintiff's abilities were impaired. It does not necessarily follow that Wong-Ngan was qualified to determine the *cause* of the impairment. In fact, Wong-Ngan referred plaintiff to a neurologist to have that doctor determine whether plaintiff had some organic condition or problem that was responsible for her memory deficits.

The record shows that Wong-Ngan worked *in conjunction* with medical doctors to determine (1) whether a

patient suffers from cognitive or psychological impairments and (2) whether or not those impairments, if found, are caused by an organic or psychological problem. Wong-Ngan herself admitted that, having determined that plaintiff was suffering deficits, she referred plaintiff to a medical doctor to explore the sources of her deficits.

Furthermore, when Wong-Ngan was asked about the tests she had done to determine whether plaintiff had mental deficits, she stated that she had performed a "battery of cognitive tests such as intelligence tests, memory tests, tests for concentration and attention, tests of verbal skill, [and] visual perceptual kinds of abilities." As a result of that testing, Wong-Ngan testified that she had diagnosed plaintiff with memory deficits. Wong-Ngan did not testify that she had performed any test that would divine the source of plaintiff's mental deficits. The only evidence Wong-Ngan had about a possible cause of the deficits was plaintiff's own statement to Wong-Ngan about the incident involving defendant. Defendant's repeated objection to Wong-Ngan's testimony about the cause of plaintiff's deficits was that plaintiff had failed to lay a proper foundation for the testimony. It may be that Wong-Ngan is, in fact, qualified to determine medical causation, but the trial court was not required to conclude that on *this* record. It is not our function to reweigh the evidence to reach our own conclusion on that issue. That is what the majority has done in this case.

The majority glosses over that point by asserting that the trial court's ruling was based

"on the erroneous premise that only medical doctors are qualified to render an expert opinion on the causation of cognitive deficits[.]"

143 Or App at 180. The majority's conclusion on that point is based on speculation.

Although the objections raised by defendant focused on the fact that Wong-Ngan was not a medical doctor, plaintiff responded to the objections by eliciting testimony from Wong-Ngan that sought to establish that Wong-Ngan was qualified to testify about medical causation notwithstanding the fact that she was not a medical doctor. As I explain above,

that testimony was equivocal and did not require the court to conclude that Wong-Ngan was so qualified. Because the court did not explain the basis of its ruling, it is not possible to know whether its ruling was based on the erroneous premise that only medical doctors could testify about medical causation in this case, as the majority asserts, or on the premise that Wong-Ngan had failed to persuade the court that she was qualified to do so. Under that circumstance, we are required to assume that the court ruled on a proper rather than an improper basis.

The majority also claims that *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 449 P2d 426 (1969), and *Barrett v. Coast Range Plywood*, 294 Or 641, 661 P2d 926 (1983), support its conclusion that the court erred in refusing to permit Wong-Ngan to testify about medical causation. Neither case supports the majority's position.

*Sandow* was a Jones Act case for injuries sustained by a seaman on a vessel. In that case, the court ruled that the trial court had erred in excluding expert testimony by a clinical psychologist that the plaintiff suffered from depression as a result of a superficial cut that he had received on his forehead. The excluded testimony concerned the *psychological* cause of the plaintiff's mental condition, not the organic or medical cause of it. The case simply recognized that properly qualified psychologists can testify as experts about psychological and emotional conditions. It did not establish as a matter of law that psychologists can give expert testimony in which they identify the organic causes of those conditions.[2]

*Barrett* was a workers' compensation case in which the court held that the Workers' Compensation Board had erred in refusing to consider testimony by medical doctors about the psychological component of a worker's disability. The worker had suffered a physical injury to his lower back. Medical doctors testified that the worker's disabling pain involved a "functional overlay," which in that case meant that the pain had both organic and nonorganic causes.

---

[2] In other words, *Sandow* established that a psychologist can testify about the emotional and psychological effects of an acknowledged organic injury. It did not establish that a psychologist can give her opinion about whether a person has suffered an organic injury to her brain, which is the issue presented in this case.

Because the medical doctors were not trained in psychiatry, the Board refused to consider their testimony about the non-organic cause of the pain. The court reversed, holding that medical doctors are qualified to diagnose functional overlays and, hence, are qualified to give expert opinions about them.

That makes sense. A medical doctor must be able to distinguish between organic and nonorganic causes of a condition in order to do the doctor's job. It does not follow, however, that a psychologist must have an equivalent capacity. On the record in this case, the trial court properly could conclude that Wong-Ngan's function as a neuropsychologist was limited to determining whether plaintiff had any cognitive deficits, and did not include determining the organic cause of those deficits. Consequently, the trial court did not abuse its discretion in excluding testimony by Wong-Ngan on the latter issue.[3] The majority errs in concluding otherwise.[4]

Richardson, C. J., and Warren, J., join in this dissent.

---

[3] To avoid any misunderstanding, it is important to emphasize that a decision affirming the trial court would establish only that, on this record, the trial court acted within its discretion in excluding Wong-Ngan's testimony about the organic cause of the cognitive deficits that she found. It would not establish a general principle about the admissibility of such testimony by neuropsychologists.

[4] Plaintiff also assigns error to the trial court's refusal to give Uniform Civil Jury Instruction 24.01 on *res ipsa loquitur*. On the record in this case, I would affirm the trial court on that issue as well as on the other issue raised by plaintiff on appeal.