JANNETT J. MARTIN AND RICHARD W. MARTIN, PLAINTIFFS v. JOHN MICHAEL BENSON AND INDUSTRIAL ELECTRIC, INC., DEFENDANTS

No. COA95-1417

(Filed 18 February 1997)

**Evidence and Witnesses § 2279 (NCI4th)— automobile accident—medical causation of injuries—testimony of neuropsychiatrist**

Plaintiffs were entitled to a new trial in a negligence action arising from an automobile accident where the trial court erred by allowing an expert neuropsychologist to testify that plaintiff Jannett Martin had not suffered a closed head injury. There is no statute specifically defining the practice of neuropsychology in North Carolina, but it is evident from N.C.G.S. § 90-270.2(8) and

MARTIN v. BENSON

[125 N.C. App. 330 (1997)]

N.C.G.S. § 90-270.3 that the practice of psychology does not include the diagnosis of medical causation.

**Am Jur 2d, Expert and Opinion Evidence §§ 56-58, 180.**

Judge LEWIS dissenting.

Appeal by plaintiffs from judgment entered 13 June 1995 by Judge W. Douglas Albright in Guilford County Superior Court. Heard in the Court of Appeals 24 September 1996.

*Mary K. Nicholson; and Joseph A. Williams; for plaintiff-appellants.*

*Frazier, Frazier & Mahler, L.L.P., by Torin L. Fury, for defendant-appellees.*

WALKER, Judge.

On 28 November 1990, plaintiff, Jannett Martin, was operating a motor vehicle when the truck operated by defendant, John Benson, crossed the median and collided with plaintiff. The truck was owned by defendant, Industrial Electric, Inc. Defendant's negligence was stipulated and the jury awarded plaintiff damages in the amount of $50,000.00.

Plaintiff's evidence established that prior to the accident she was a very active and social person, but after the accident she became quiet and depressed. The evidence also showed that she was treated for headaches, depression, chronic pain, not sleeping or eating, anxiety, crying spells and memory difficulty and that she was employed before the accident, but became disabled and unable to work afterward. She incurred medical expenses in the amount of $100,041.22.

Plaintiff presented medical evidence of her course of treatment after the injury. This evidence included the testimony of Dr. James Adelman, a neurologist who specialized in treating patients with headaches. Dr. Adelman first saw plaintiff on 18 January 1991 and diagnosed her with musculoskeletal pain, post traumatic and post-concussion headaches. He stated that even though plaintiff did not report losing consciousness from the accident, the fact that plaintiff reported feeling dazed at the time of the accident was sufficient to show an alteration in the functioning of the brain, which is symptomatic of a closed head injury. Dr. Adelman's testimony included the following:

Q: Okay. All right. So, do you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty as to whether or not the original diagnosis you made was directly related to or could or might have been related to the accident of November 28, 1990?

. . .

A: Yes, I do.

Q: What is that opinion?

A: I believe that the headaches were a result of the accident.

Q: Okay. You then undertook to treat her; is that right?

A: That's correct.

Q: Okay. Initially you were treating her for headaches; is that correct?

A: Yes, it is.

Q: Okay. And did you have any—did you at some point have any further diagnosis with regard to her condition?

A: Well, I had the diagnoses that I quoted. And the musculoskeletal pain, post traumatic. The second one was the headaches, post-concussion. And the third diagnosis was that of depression.

Q: Okay. At some point did you diagnose a closed head injury?

A: Yes. And I think that the closed head injury, the fact that she had a concussion implies closed head injury.

Q: Okay. Tell the members of the jury whether or not if a person has to actually lose consciousness in order to have a concussion?

A: Well, a concussion is made if there is alteration in the functioning of the brain. And she [had] alteration in the functioning of her brain because she was dazed after the accident. She was disoriented. She didn't know where she was and was unable to function. So, there was no question about the fact that she had a trauma to the brain itself and a head injury.

On 27 March 1995, defendants moved to have plaintiff examined by a neuropsychologist for the purpose of updating information on plaintiff's medical condition. Thereafter, a week before the trial

MARTIN v. BENSON

[125 N.C. App. 330 (1997)]

began on 17 April 1995, plaintiff submitted to an evaluation by a neuropsychologist, Dr. Elizabeth Gamboa, who was retained by the defendants. Dr. Gamboa examined plaintiff for approximately three hours and reviewed plaintiff's medical records. At trial Dr. Gamboa was permitted to testify as follows:

Q: Now, you had an occasion to perform—well, not only perform but review certain tests of Mrs. Martin, and I won't go through all of that again, but as a result of your review of the records, both psychiatric and medical, and as a result of your independent testing did you form certain conclusions concerning a neurological state?

A: Yes.

Q: And what were those conclusions?

A: My conclusions were that the records and her presentation and her test results on all of the times she was tested are consistent with a diagnosis of cognitive impairments due to depression and the effects of medications and not to a closed head injury. I do not believe that a closed head injury is present. I do believe that she has memory problems. I think those memory problems are very real. I think they are reversible because they are due to depression and to medication effects. So, if she is taken off the medications which are causing the memory problems and is treated for her depression, the memory problems will clear up.

Q: Do you have an opinion, Dr. Gamboa, based on your review of all the records and of your seeing Mrs. Martin and the tests you administered to whether or not she suffered a closed head injury in this accident?

A: Yes.

Q: What is your opinion?

A: That she did not.

Q: Do you have an opinion, Dr. Gamboa, as a result of reviewing all the records surrounding the accident as to whether or not she has been disabled from work because of this accident?

A: Yes.

Q: What is your opinion?

A: That she is not disabled from work.

MARTIN v. BENSON

[125 N.C. App. 330 (1997)]

Plaintiff argues that Dr. Gamboa was allowed to testify as to her own medical diagnosis and opinion of disability based on that diagnosis when, by statutory definition of her profession, she had no expertise. According to Dr. Gamboa, she received a bachelor's degree in psychology, obtained a doctorate degree in psychology and completed a post-doctoral year of training in neuropsychology. At the time, she was working as a neuropsychologist in a brain injury unit at a rehab hospital. Defendant contends it was within the trial court's discretion whether to allow Dr. Gamboa's testimony under N.C. Gen. Stat. § 8C-1, Rule 702 and absent an abuse of discretion, there was no error in the trial court's admitting this evidence.

The issue presented in this case, whether a neuropsychologist is qualified to testify that the plaintiff did not suffer a closed head injury in this accident, appears to be one of first impression in this State. In other jurisdictions which have considered similar issues, the courts have split. The jurisdictions allowing the neuropsychologist to testify regarding the medical causation of a plaintiff's condition base their arguments on an interpretation of the state's rule of evidence patterned after the Federal Rule of Evidence 702, dealing with the expert witness testimony. *See Hutchison v. American Family Mut. Ins. Co.*, 514 N.W.2d 882 (Iowa Sup. Ct. 1994); *Cunningham v. Montgomery, D.M.D.*, 921 P.2d 1355 (Or. Ct. App. 1996).

In *Hutchison*, the Iowa Supreme Court observed that while the practice of medicine was statutorily excluded from the practice of psychology in its state, nevertheless, the Court would follow a liberal interpretation of Rule 702 and allow such testimony if the criteria for qualification under Rule 702 were met. *Hutchison*, at 887-88.

The Oregon Court of Appeals, in its recent decision of *Cunningham*, supra, follows the holding of the Iowa court. Again, the Oregon court noted that its Rule 702 reflected the view that an expert witness on a medical subject need not be a person licensed to practice medicine. The Court reversed the trial court, which had limited the neuropsychologist's testimony to identifying mental impairments of the plaintiff, holding that the neuropsychologist could testify to the medical causation of plaintiff's condition. *Cunningham*, at 1360.

However, in a well reasoned dissent, the minority pointed out that the neuropsychologist testified that she was a specialist who focused on the mental and behavioral characteristics of individuals who have brain impairment due to dementia, other brain disease or

**MARTIN v. BENSON**

[125 N.C. App. 330 (1997)]

head injury. Therefore, the neuropsychologist was qualified to test plaintiff's mental abilities and express an opinion about whether plaintiff's abilities were impaired and it did not necessarily follow that the neuropsychologist was qualified to determine the cause of the impairment. The minority then concluded that, "[a] medical doctor must be able to distinguish between organic and nonorganic causes of a condition in order to do the doctor's job. It does not follow, however, that a psychologist must have an equivalent capacity." *Id.* at 1363-64.[1]

Further, the State of Georgia does not allow neuropsychologists to testify as to medical causation based on its stautory definition of the practice of psychology. In *Chandler Exterminators, Inc. v. Morris et al.*, 416 S.E.2d 277 (Ga. Sup. Ct. 1992), the Supreme Court of Georgia reversed its Court of Appeals, holding that the trial court did not abuse its discretion in refusing to permit a neuropsychologist to testify that the plaintiffs had organic brain damage from exposure to chemicals. The Court upheld the trial court's determination that "[the neuropsychologist], though qualified to state which mental dysfunctions [p]laintiffs may be suffering, is not competent to testify as to causation to a reasonable degree of medical certainty." The Court, in finding the statute defining and limiting the practice of psychology to be controlling authority, observed that medical causation is not a subject within the scope of a psychologist's expertise. *Id.* at 278.

In this case, the trial court, in allowing the testimony of Dr. Gamboa, relied upon N.C. Gen. Stat. § 8C-1, Rule 702 (1992). The rule provides:

Testimony by experts.

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

A reading of this statute alone arguably would support the admission of Dr. Gamboa's testimony. Patients were referred to her from neurologists when they were not sure whether a closed head injury existed or if there was some mental or emotional problem causing the symptom the patient was reporting. Dr. Gamboa's training and

---

1. There is no reference in the decision to any statute which defines the practice of psychology or neuropsychology in Oregon.

experience would further suggest that she could ". . . assist the trier of fact to understand the evidence or determine a fact in issue . . ." as required by Rule 702. However, we must consider Rule 702 in light of this State's statutes defining the practice of "psychology."

There is no statute specifically defining the practice of "neuropsychology" in our State. Only the practice of psychology is defined in N.C. Gen. Stat. § 90-270.2(8) (1993) as follows:

> Practice of psychology.—The observation, description, evaluation, interpretation, or modification of human behavior by the application of psychological principles, methods, and procedures for the purpose of preventing or eliminating symptomatic, maladaptive, or undesired behavior or of enhancing interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, or mental health. The practice of psychology includes, but is not limited to: psychological testing and the evaluation or assessment of personal characteristics such as intelligence, personality, abilities, interests, aptitudes, and neuropsychological functioning; counseling, psychoanalysis, psychotherapy, hypnosis, biofeedback, and behavioral analysis and therapy; diagnosis and treatment of mental and emotional disorder or disability, alcoholism and substance abuse, disorders of habit or conduct, as well as of the psychological aspects of physical illness, accident, injury, or disability; and psychoeducational evaluation, therapy, remediation, and consultation. Psychological services may be rendered to individuals, families, groups, and the public. The practice of psychology shall be construed within the meaning of this definition without regard to whether payment is received for services rendered.

Further, N.C. Gen. Stat. § 90-270.3 (1993) places additional restrictions on the practice of psychology. This section states:

**Practice of medicine and optometry not permitted.**

> Nothing in this Article shall be construed as permitting licensed psychologists or licensed psychological associates to engage in any manner in all or any parts of the practice of medicine or optometry licensed under Articles 1 and 6 of Chapter 90 of the General Statutes, including, among others, the diagnosis and correction of visual and muscular anomalies of the human eyes and visual apparatus, eye exercises, orthoptics, vision training, visual training and developmental vision. A licensed psychologist or licensed psychological associate shall assist his or her

MARTIN v. BENSON

[125 N.C. App. 330 (1997)]

client or patient in obtaining professional help for all aspects of the client's or patient's problems that fall outside the boundaries of the psychologist's own competence, including provision for the diagnosis and treatment of relevant medical or optometric problems.

Where these statutes use language as ". . . diagnosis and treatment of mental and emotional disorder or disability . . .," it is evident that the practice of psychology does not include the diagnosis of medical causation.

Defendant urges us to interpret our case of *Horne v. Marvin L. Goodson Logging Co.*, 83 N.C. App. 96, 349 S.E.2d 293 (1986), as holding that the testimony of a neuropsychologist was competent in a workers' compensation claim even though the neuropsychologist's opinion was contrary to the testimony of the neurosurgeon and that if this testimony was competent, it was admissible for the purposes of determining whether the injured worker had received a brain injury. However, a close reading of *Horne* reveals that our Court limited its holding to finding that the Industrial Commission erred in concluding that the neuropsychologist's testimony was "incompetent." *Id.* Certainly a properly qualified neuropsychologist is competent to testify as an expert about psychological and emotional conditions of a patient without expressing an opinion as to the organic causes of those conditions. Likewise, the neuropsychologist would be competent to testify as an expert that the psychological and emotional conditions of a patient are not consistent with other patients who have been medically diagnosed with brain injuries.

We conclude that Dr. Gamboa, in expressing an opinion that the plaintiff did not suffer a closed head injury in this accident, testified as to medical causation. This testimony invades the field reserved for the practice of medicine in this State. The privileges and limits of the psychology profession are primarily matters to be determined by our legislature. Any extension of such privileges and limits must be made by legislative enactment, not court decision. Thus, the trial court erred in allowing this portion of Dr. Gamboa's testimony, entitling plaintiff to a new trial and we need not consider plaintiff's other assignment of error.

New trial.

Judge LEWIS dissents.

Judge MARTIN, Mark D. concurs.

**MARTIN v. BENSON**

[125 N.C. App. 330 (1997)]

Judge LEWIS dissenting.

Because I feel that the Rules of Evidence control in this case and should not be diluted by other statutes, I respectfully dissent.

In *State v. Parks*, 96 N.C. App. 589, 386 S.E.2d 748 (1989), this Court acknowledged our standard of review of a trial court's ruling under Rule 702:

> A trial court is afforded wide latitude in applying Rule 702 and will be reversed only for an abuse of discretion. Moreover, the determination whether the witness has the requisite level of skill to qualify as an expert witness is ordinarily within the exclusive province of the trial judge, and "[a] finding by the trial judge that the witness possesses the requisite skill will not be reversed on appeal unless there is no evidence to support it."

*Parks*, 96 N.C. App. at 592, 386 S.E.2d at 750 (quoting *State v. Bullard*, 312 N.C. 129, 322 S.E.2d 370 (1984)). Furthermore, our cases demonstrate that "[i]t is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession." *State v. Evangelista*, 319 N.C. 152, 163-64, 353 S.E.2d 375, 383 (1987). It is enough that the expert witness "because of his expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Wilkerson*, 295 N.C. 559, 569, 247 S.E.2d 905, 911 (1978). Additionally, "[i]t is the function of cross-examination to expose any weaknesses in [expert opinion] testimony." *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 244, 311 S.E.2d 559, 571 (1984).

The majority states that Dr. Gamboa's testimony "invades the field reserved for the practice of medicine in this State." However, in *Maloney v. Hospital Systems*, 45 N.C. App. 172, 262 S.E.2d 680, *disc. review denied*, 300 N.C. 375, 267 S.E.2d 676 (1980), this Court held that nurses are qualified to render expert opinions as to medical causation, even though they are not medical doctors. *Maloney*, 45 N.C. App. at 177-79, 267 S.E.2d at 683-84. The Court reached this decision after noting that "the giving of expert testimony should not be limited to those witnesses who are licensed in some particular field of endeavor" and finding "no basis or justification for treating medical experts differently—for establishing a preferred or exclusive class among medical expert witnesses." *Id.* at 178, 267 S.E.2d at 684. This holding was subsequently adopted by the Supreme Court in *State v. White*, 340 N.C. 264, 294, 457 S.E.2d 841, 858, *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 436 (1995).

**MULLINS v. N.C. CRIM. JUSTICE EDUC. AND TRAIN. STDS. COMM.**

[125 N.C. App. 339 (1997)]

I find the reasoning and holding of the Court in *Maloney* controlling in the present case. I believe we are bound to follow the majority of states which permit a psychologist to testify as to medical causation as long as she or he possesses the requisite knowledge to be found an expert under Rule 702 by the trial judge. *See Hutchinson v. American Family Mut. Ins.*, 514 N.W.2d 882, 886 (Iowa 1994). Defendants have indisputably provided more than ample evidence that Dr. Gamboa is an expert by training and experience. Her testimony would assist the trier of fact, if they found it credible, after cross-examination. Her testimony is admissible as the trial judge found.

Dr. Gamboa testified that she is a psychologist who specializes in brain injuries, has both a bachelor's degree and a doctorate degree in psychology, is currently on a brain injury team at a rehabilitation hospital, and is on a list of neuropsychologists established by the Department of Public Instruction who are qualified to diagnose brain injuries. These educational and professional accomplishments are more than sufficient to enable Dr. Gamboa to testify that in her expert opinion, plaintiff did not have a closed head injury as a result of this accident. The jury, if it so chooses, may then take the fact that she is not a medical doctor into account when determining how much weight to give her testimony.

Because I find no abuse of the trial court's discretion in allowing the testimony in this case, I would affirm its ruling.