705 A.2d 402

BEVERLY ADAMSON, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. ROSARIO CHIOVARO, C & G IMPORTED CAR REPAIRS, AND JOHN DOES A THROUGH Z (FICTITIOUS NAMES), DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 6, 1997—Decided February 4, 1998.

Before Judges BROCHIN, WEFING and BRAITHWAITE.

*Norman S. Karpf* and *Joseph Buttafuoco* argued the cause for appellants/cross-respondents (*Buttafuoco, Karpf & Arce*, attorneys; *Mr. Buttafuoco*, on the brief).

*Wayne D. Greenfeder* argued the cause for respondent/cross-appellant (*Kraemer, Burns, Mytelka & Lovell,* attorneys; *Douglas E. Burns* and *Mr. Greenfeder,* of counsel; *Mr. Greenfeder,* on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

This case revolves around an automobile accident that occurred on September 18, 1991 shortly after 7:00 p.m. on Woodland Avenue in West Orange, New Jersey. The site of the accident was immediately in front of Montclair Riding Academy. Plaintiff Beverly Adamson, who had several horses stabled there, served as the volunteer leader of a 4-H club which met at the stables. On the date in question, she left a 4-H meeting and went to her car, a Range Rover, which she had parked facing westbound on the north side of Woodland Avenue.

Woodland Avenue runs in an east-west direction. When cars are parked on either side of the road, as they were that evening, there is room for one lane of travel in both directions. The lanes are divided by a double yellow line.

As she started to pull out of her parking space, she realized that she had left certain papers at the Academy that she needed. Rather than pulling back into the space she had just vacated, she decided to pull into the driveway of the Academy's main building and run into the office to retrieve the papers she needed. She proceeded in a westbound direction on Woodland Avenue for four to five car lengths until she pulled opposite to the driveway.

Some distance past the driveway, Woodland Avenue curves. The parties differed in their testimony as to the distance from the driveway to the curve. Plaintiff estimated 200 to 300 feet while defendant [1] said it was closer to 800 feet.

---

[1] There are two named defendants, Rosario Chiovaro, the driver, and C & G Imported Car Repairs, the owner of the vehicle. Although there was no proof of

As plaintiff began her turn into the driveway, she saw defendant's car coming around the curve, heading eastward. She maintained she brought her car to a complete stop, with its left front portion approximately two feet over the double yellow line. The two cars collided. Defendant was driving a much smaller car, a Fiat, that went under plaintiff's Range Rover. The force of the impact moved plaintiff's car sideways approximately one and one-half feet and popped the rear seats out of their locked position.

Plaintiff estimated defendant's speed at fifty-five to sixty miles per hour. The posted speed limit on the road is twenty-five miles per hour. At trial, defendant maintained that he was driving twenty-five to thirty miles per hour and that plaintiff improperly made a left turn right in front of him.

Plaintiff contended that the force of the impact threw her body to the left side of the vehicle and that her head struck the door and the frame. She refused any medical assistance at the scene, however. After several days, she commenced an extended course of treatment with a chiropractor. When that did not provide relief, she went to an orthopedist, a neurosurgeon, a neurologist, two psychiatrists and a neuropsychologist. Her neurosurgeon, Dr. Hoppenstein, diagnosed a herniated disc in her cervical spine with spinal cord compression, for which he recommended surgery.

Within this lawsuit, plaintiff alleged that she also suffered a closed head injury which resulted in significant cognitive impairment that interfered with her ability to function either socially or at work. She had worked for years in the color lab business. Several months before the accident, she had started her own brokerage business, serving major companies that needed photographic and graphic services and the color labs that provided those services. She testified that in the nine months before the accident she had a net income of approximately $190,000. As a result of her cognitive deficits, however, she was no longer able to

---

independent negligence on the part of C & G, no motion to dismiss was ever made. References in this opinion to defendant refer to Chiovaro.

function in the same manner and her income therefore steadily declined to $58,000 by 1994. As of the trial, she testified she had only one client left.

At trial, she produced her psychiatrist, neurosurgeon and neuropsychologist. Defendant produced no medical evidence at all.

After a seven day trial, the jury found that defendant was negligent and proximately caused the accident. It found no negligence on the part of plaintiff. It awarded her $20,000 for non-economic damages, $80,000 for past lost wages and $500,000 for future lost wages.

Defendant has appealed and plaintiff has cross-appealed. After carefully reviewing the entire record in this matter, and considering the arguments presented, we affirm.

Defendant has raised eleven points on appeal. Six of these deal with the trial itself and the post-trial motions; the balance relate to the form of judgment entered and whether it properly accounts for collateral sources available to plaintiff.

## I.

Defendant contends that the trial court should have granted his motion for a new trial because the verdict is against the weight of the evidence and the damages demonstrate it was a product of sympathy and bias. The trial court's consideration of defendant's motion was governed by *R.* 4:49–1(a) which provides that a trial court should grant such a motion "if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." We, of course, may not reverse the decision of the trial court on such a motion "unless it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1. Further, we must defer to the trial court's assessment of such things as witness credibility and the "feel of the case." *Dolson v. Anastasia*, 55 *N.J.* 2, 6–8, 258 *A.*2d 706 (1969). In this regard, we note merely the trial court's observa-

tions during the argument on the motion that "you could clearly find a lack of candor" on defendant's part and that he considered some of the testimony proffered by defendant "outrageous." We have no basis to interfere with the trial court's handling of this motion.

Defendant contends that the trial court committed reversible error by permitting the jury, completely unsupervised, to visit the scene of the accident. While we admit to some surprise that this was done, it was done with the consent of both counsel. Counsel having consented at the time, we decline to interfere on appeal. We strongly caution the trial court, however, against employing such a procedure in the future. Because of the informal manner in which this was handled, it is impossible to know how many of the jurors visited the scene and how many did not. If any members of the panel did not visit the scene, they were dependent on their fellow jurors who would, in effect, become witnesses. The record is also silent whether there were any differences in lighting or weather conditions which may have affected the jurors' views and analysis. We note in this regard that while the accident occurred on a September evening, the trial and the jury visit took place in June. We understand that the trial court's action was well-intentioned, but it posed a needless risk of interjecting extraneous matters into the jurors' deliberations.

During the course of the trial, plaintiff presented the testimony of Dr. Wayne A. Gordon, a neuropsychologist. Dr. Gordon holds a Ph.D. in psychology, not a degree in medicine. Over defendant's objection, Dr. Gordon testified about the psychological testing he performed upon plaintiff and his conclusions regarding the cognitive deficits from which plaintiff suffered, and he expressed the opinion that those deficits were causally linked to this accident. Defendant maintains that Dr. Gordon was not qualified to express such opinions since he lacks a medical degree.

The decision whether a witness has the requisite experience and credentials to qualify as an expert witness rests in the trial court's sound discretion. *Carey v. Lovett*, 132 *N.J.* 44, 64, 622

*A.*2d 1279 (1993). In light of Dr. Gordon's extensive background, we perceive no abuse by the trial court. We note, for instance, that Dr. Gordon is a diplomate in neuropsychology, serves as the director of the traumatic brain injury program at Mount Sinai Hospital in New York City and is a professor of rehabilitation medicine at Mount Sinai, in which position he teaches both medical residents and graduate psychology students. Nothing within *Crespo v. McCartin,* 244 *N.J.Super.* 413, 582 *A.*2d 1011 (App.Div. 1990) or *Thompson v. Merrell Dow Pharmaceuticals,* 229 *N.J.Super.* 230, 551 *A.*2d 177 (App.Div.1988), upon which defendant relies, would preclude Dr. Gordon from testifying in the manner in which he did. To the extent that Florida has expressed a contrary view in *GIW Southern Valve Co. v. Smith,* 471 *So.*2d 81 (Fla.App. 1985), we do not agree.

■ Defendant claims that two comments by plaintiff's counsel in his summation constitute reversible error and that the verdict for future lost wages cannot be sustained since plaintiff did not present an expert in economics. Neither claim has any merit. *R.* 2:11–3(e)(1)(E). We note only in regard to the second claim that defendant had every opportunity in discovery and at trial to challenge plaintiff's income assertions but did not do so.

## II.

The balance of defendant's arguments revolve around the calculation of credits to which he was entitled as a result of New Jersey's collateral source rule. *N.J.S.A.* 2A:15–97. The issues do not lend themselves to easy resolution for plaintiff was a resident of New York and was insured under two separate policies, providing different forms of benefits, both of which were issued in New York State.

■ The collateral source statute calls for the deduction from any award to a plaintiff of the benefits received for injuries suffered from any source other than workers' compensation or life insurance. The purpose of the statute, of course, is to prevent a

plaintiff from recovering cumulative, duplicative benefits. *Thomas v. Toys "R" Us, Inc.*, 282 *N.J.Super.* 569, 584, 660 *A.*2d 1236 (App.Div.), *certif. denied,* 142 *N.J.* 574, 667 *A.*2d 191 (1995).

Plaintiff's automobile was insured under a policy issued by the Kemper Group. It provided personal injury protection benefits with an overall limit of $100,000, which included both medical expenses and a work loss benefit of $2,000 per month. Plaintiff apparently retained the right to designate whether the benefits payable to her should be considered as payments for her medical expenses or her wage losses. We are informed that Kemper, through the time of trial, had paid plaintiff slightly in excess of $21,000 for medical expenses and nearly $50,000 for past lost wages. We are further informed that while Kemper had initially refused to make any additional payments, that issue has since been resolved, with plaintiff receiving for medical expenses the balance payable under the policy.

Plaintiff also had a disability policy issued by Paul Revere Insurance Company which provided fluctuating monthly benefits keyed to what plaintiff earned, with a maximum monthly payment of $4,000. Paul Revere informed defendant's counsel that it had paid more than $131,000 to plaintiff under this policy through July 1995. In September 1995, Paul Revere notified plaintiff that it had determined, following an independent medical examination, that plaintiff had not suffered a significant cognitive impairment from this accident and that it was therefore terminating her disability benefits. By the time this matter was orally argued before us in November 1997, plaintiff had not formally challenged that termination.

Finally, plaintiff received certain New York State disability benefits for twenty-six weeks. According to defendant's counsel, these totaled $4,420.

Faced with these facts, the trial court concluded that defendant was only entitled to a credit of $80,000 to be applied to the award for past lost wages. Although it is not entirely clear

from the record, we assume that the trial court computed the amounts plaintiff had received for economic loss under her Kemper policy, her Paul Revere policy and New York State disability by the time of trial and concluded that the total exceeded the jury verdict for her past lost wages. The trial court's conclusion that defendant was entitled to receive a credit of at least that amount was correct.

Defendant goes on to urge, however, that it should receive a credit for the entire amount paid under these policies, even those sums intended to make plaintiff whole for her medical expenses. Defendant has presented no cogent reason, however, why it should receive such a benefit.

The jury awarded plaintiff less for her past economic loss than her own insurance policies paid her. Defendant seeks to apply that difference to the verdict for future economic loss. We are satisfied, however, that defendant is not entitled to any further credits from the amounts plaintiff received from her own insurers for her past economic loss.

*N.J.S.A.* 2A:15–97 calls for the deduction of any amount a plaintiff has received which "duplicates any benefit contained in the award." "Statutes must be read sensibly so as to provide interpretations consistent with their legislative purpose and to avoid unreasonable results." *Adams v. Cooper Hosp.*, 295 *N.J.Super.* 5, 12–13, 684 *A.2d* 506 (App.Div.1996), *certif. denied,* 148 *N.J.* 463, 690 *A.2d* 610 (1997). The policies underlying the collateral source rule do not require that we find that sums paid by the insurers to compensate for past economic loss duplicate the jury verdict for future lost wages. To do so would award defendant or his insurance carrier what would be, in essence, a windfall.

More troubling, however, is the possibility that plaintiff may, in the future, institute proceedings against Paul Revere to challenge its denial of continuing benefits for economic loss. If

she were to do so and be successful, she would receive a duplicate benefit and defendant would lose the benefit of the collateral source. On its face, these circumstances offend the purposes of New Jersey's collateral source rule. The issue thus presents itself, whether defendant should be entitled to a credit, be it in the future or computed now and applied on a discounted basis. We have recently addressed, in a slightly different context, the problems inherent in attempting, in a present judgment, to account for "future unpredictable events or conditions." *Parker v. Esposito,* 291 *N.J.Super.* 560, 567, 677 *A.*2d 1159 (App.Div.), *certif. denied,* 146 *N.J.* 566, 683 *A.*2d 1162 (1996). Such problems are accentuated in a matter such as this, in which any benefits plaintiff might receive in the future are payable only on a monthly basis and cease in the event of her death before age sixty-five. We cannot close our eyes, moreover, to the practicalities; plaintiff has little incentive to challenge Paul Revere's actions if any recovery she were to receive redounded to defendant's benefit.

We have concluded that in a context such as this the proper remedy is to declare defendant, upon payment of the judgment, subrogated to plaintiff's right to proceed against Paul Revere. Subrogation is an equitable remedy, invoked " 'to serve the interests of essential justice between the parties.' " *Culver v. Insurance Co. of North America,* 115 *N.J.* 451, 456, 559 *A.*2d 400 (1989) (citation omitted). It is intended to insure that an obligation is paid by the one who ought to pay it. *Hayes v. Pittsgrove Township Bd. of Educ.,* 269 *N.J.Super.* 449, 454–55, 635 *A.*2d 998 (App.Div.1994). It has been described as a "highly favored" doctrine. *Culver, supra,* 115 *N.J.* at 456, 559 *A.*2d 400.

If defendant successfully establishes in a subrogation action that Paul Revere is obligated to plaintiff under the terms of the disability policy, it would be entitled to receive from Paul Revere such sums as may be due, up to the amount it has paid plaintiff to compensate her for her future economic loss in accordance with the jury's verdict and the judgment entered. We are satisfied that subrogation will achieve both essential justice between the

parties and the ends of the collateral source statute. *N.J.S.A.* 2A:15–97.[2]

Defendant's last contention is that the trial court should have suspended the running of prejudgment interest since it was not responsible for the delay between the return of the jury's verdict on June 23, 1995 and the entry of the final judgment on December 22, 1995. We defer to the trial court's conclusion that the delay was attributable to the complexities of the collateral source issues in this matter. To suspend that interest would unfairly penalize plaintiff.

Finally, we turn to plaintiff's cross-appeal. We note at the outset that we choose not address the issue of whether plaintiff's motion for a new trial was timely under *R.* 4:49–1(b) for plaintiff has framed her cross-appeal as a contingent one; she argues that if we find error under any of defendant's contentions, she should receive a new trial on damages. Since we have found no error, we dismiss the cross-appeal as moot.

The judgment of December 22, 1995 is affirmed; the cross appeal is dismissed.

---

[2] We were informed at oral argument that defendant or his carrier had recently instituted a direct action against Paul Revere. We express no opinion on the viability of any of the claims asserted in that action.