**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 13 2012, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JAMES C. SPENCER**
Dattilo Law Office
Madison, Indiana

ATTORNEYS FOR APPELLEE
SCOTT MEMORIAL HOSPITAL:

**RICHARD T. MULLINEAUX**
**CRYSTAL G. ROWE**
Kightlinger & Gray, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ANTHONY MICHAEL BECK, and SANDRA BECK, natural parents and next friends of JACOB LESLIE BECK, minor, <br><br> Appellants, <br><br> vs. <br><br> SCOTT MEMORIAL HOSPITAL and LARRY HUNEFELD, M.D., <br><br> Appelles. | ) ) ) ) ) ) ) ) No.  72A01-1107-CC-293 ) ) ) ) ) ) |

APPEAL FROM THE SCOTT SUPERIOR COURT
The Honorable Maria D. Granger, Special Judge
Cause No.  72D01-0710-CC-160

**June 13, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

STATEMENT OF THE CASE

In this interlocutory appeal, Anthony Michael Beck and Sandra Beck (collectively, "the Becks"), natural parents and next friends of Jacob Leslie Beck ("Jacob"), a minor, appeal the trial court's grant of a motion in limine filed by Scott Memorial Hospital ("Scott Memorial").

We affirm.

ISSUE

Whether the trial court abused its discretion in granting Scott Memorial's motion in limine that excluded the Becks' expert medical causation witness from testifying at trial.

FACTS

On October 28, 1997, at Dr. Larry Hunefeld's ("Dr. Hunefeld") direction, a pregnant Sandra was admitted to Scott Memorial for treatment of high blood pressure. While at Scott Memorial, Sandra gave birth to Jacob, a 37-week gestational age male infant. At the time of delivery, Jacob was apneic (not breathing) and limp. Scott Memorial's staff resuscitated Jacob. The next day, Jacob displayed "jitteriness" that reduced over the course of his hospitalization. (Becks' App. at 26-27).

At approximately two years of age, Jacob began showing signs of mild cerebral palsy. The Becks eventually filed a complaint in the Scott Superior Court alleging that Jacob developed cerebral palsy as a result of intrapartum asphyxia or hypoxia ("lack of oxygen during delivery") caused by the negligence of Dr. Hunefeld and Scott Memorial.[1]

---

[1] Dr. Hunefeld is not a party to this appeal.

Specifically, the Scotts alleged that Jacob suffered injury because (1) Scott Memorial failed to recognize Sandra's hypertension; (2) Dr. Hunefeld was absent at the time of delivery; (3) Dr. Hunefeld and Scott Memorial failed to provide a physician "to receive, prep, and deliver Jacob"; (4) Scott Memorial failed to properly document medical records during labor and delivery; and (5) Scott Memorial failed "to attach a fetal monitor and/or failed to continuously observe the fetal monitor . . . ."[2] (Becks' App. 19).

During pre-trial proceedings, the Becks hired Dr. George Nichols II to provide an opinion on the medical causation of Jacob's condition. Dr. Nichols opined after a study of the medical records that Jacob's condition was caused by intrapartum asphyxia/hypoxia. On May 31, 2011, a trial deposition was taken as Dr. Nichols was scheduled to attend a medical conference in Italy during the trial. Scott Memorial subsequently filed its "Motion in Limine to Exclude Testimony of Dr. George Nichols," and a hearing was held thereon. In pertinent part, Judge Granger found and ordered:

1. Dr. George Nichols' testimony is offered by Plaintiffs to provide an opinion for the jury as to the cause of [Jacob's] cerebral palsy.

2. Dr. Nichols' ability to testify reliably about [Jacob's] cerebral palsy, depends on the validity of his opinion linking hypoxia at birth to [Jacob's] cerebral palsy, specifically, the depth of his knowledge of a complicated, specialized subject matter.

3. Dr. Nichols is a pathologist with pathology meaning "the specialty of medicine dedicated to the study of human disease and the body's reaction to the disease process," and he has board certifications in anatomic, clinical and forensic pathology, and experience on the faculty at the University of Louisville in the Department of Pediatrics and Pathology.

---

[2] The Becks have never alleged that Scott Memorial negligently treated Jacob's birth asphyxia or hypoxia. To the contrary, there is no dispute that Jacob was properly resuscitated after birth. The Becks claim that Scott Memorial and Dr. Hunefeld were negligent during Sandra's labor and Jacob's delivery, and that such negligence resulted in Jacob being hypoxic at birth and ultimately developing cerebral palsy. (Becks' App. 16-21).

4. The regular practice and experience of Dr. Nichols primarily involves examining patients who are victims of abuse and determining whether somebody has inflicted injury upon a patient and, if so, whether such injury is consistent with an offense in violation of the law.

5. The last examination performed by Dr. Nichols on a patient not suspected as a victim of child abuse was probably 1977.

6. Dr. Nichols lacks any recent experience with the examination of a child to determine the etiology of cerebral palsy with the most recent dating back to the mid '70s.

7. The record presented to the Court reflects that Dr. Nichols in forming his opinion did not rely upon current medical literature directly addressing the causation issue in this case.

8. Indiana Evidence Rule 702 Testimony by Experts [applies] . . . .

9. Dr. Nichols may have expertise in diagnosing disease, but he does not possess sufficient specialized knowledge and experience to assist jurors in deciding the particular issue in this case of whether it is more likely than not that a child with [Jacob's] symptoms developed cerebral palsy as a result of the Defendant Scott Memorial Hospital's negligent treatment of the child's birth hypoxia.

10. Dr. Nichols does not have the kind of specialized knowledge or experience required to testify regarding causation in this case nor does the record reflect that he relied upon medical literature directly addressing the causation issue in this case, and this deficiency renders Dr. Nichols' expert testimony unreliable.

(Becks' App. 13-15). (citations omitted). Judge Granger certified the order for appeal, and this court accepted jurisdiction.

## DECISION

A trial court's determination regarding the admissibility of expert testimony under Indiana Evidence Rule 702 is a matter within its broad discretion and will be reversed only for abuse of that discretion. *Bennett v. Richmond*, 960 N.E.2d 782, 786 (Ind. 2012).

4

We presume that the trial court's decision is correct, and the burden is on the party challenging the decision to persuade us that the trial court abused its discretion. *Id*.

The trial court is the gatekeeper for the admissibility of expert opinion evidence under Rule 702. *Id*. With regard to the admissibility of expert testimony, Rule 702 provides:

> (a)  If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b)  Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

"By requiring trial courts to be satisfied that expert opinions will assist the fact-finder and that the underlying scientific principles are reliable, Rule 702 guides the admission of expert scientific testimony." *Bennett*, 960 N.E.2d at 786 (quoting the plurality opinion in *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001)). We will affirm the trial court's discretionary decision upon any basis supported by the record. *See Utley v. Healy,* 663 N.E.2d 229, 232 (Ind. Ct. App. 1996), *trans. denied*.[3]

Here, the trial court determined that the proposed expert opinion found in the trial deposition was unreliable, and it did so partially because Dr. Nichols did not rely on medical literature applying to causation of cerebral palsy. Our reading of Dr. Nichols'

---

[3] In their reply brief, the Becks argue that a portion of Scott Memorial's appellate brief should be stricken. In support of their argument, the Becks contend that Scott Memorial relied upon statements made by Dr. Nichols in a May 12, 2011 discovery deposition which the Becks believe was not entered into evidence below. Our review of the Scott Superior Court's chronological case summary (Becks' App. 7) and the statements of defense counsel during the hearing on the motion in limine (Tr. 106-08) discloses that the discovery deposition was entered into evidence. Therefore, we deny the Becks' request to strike. Any citations to the trial deposition refer to "Becks' App.," while citations to the discovery deposition refer to "Hospital's App."

trial deposition discloses the following cross-examination exchange between defense counsel and Dr. Nichols:

> Q: [Certain data] would have been of assistance to you in performing some of the things that you needed to perform in terms of a differential diagnosis in this case?
>
> A: Yes.
>
> Q: And the reality is, I mean, that's what the differential diagnosis is about, is it not, Doctor, where you go through each of the possible causes and establish that this didn't happen, this couldn't happen because of X, Y, Z?
>
> A: Correct, sir.

(Becks' App. 109).

The term "differential diagnosis" is more accurately denominated as "differential etiology." *Alsheik v. Guerrero*, 956 N.E.2d 1115, 1127 (2011). "In a differential etiology, the doctor rules in all the potential causes of a patient's ailment and then, by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment . . . ." *Id.* (citing *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

Dr. Nichols began his differential etiology analysis regarding the cause of Jacob's cerebral palsy by describing the disease's etiology as "multi-factorial" and "ruling in" all potential causes of Jacob's condition. (Becks' App. 99). He recognized that there are multiple causes of the disease, including: (1) an idiopathic or unknown clause; (2) chemical exposures in utero to the child; (3) amniotic fluid inflammation; (4) in utero infection; (5) in utero growth retardation; (6) congenital abnormality; (7) uterine

6

malfunction; (8) lack of prenatal care; and (9) lack of oxygen during labor and delivery. (Becks' App. 99-100; 109-10); (Hospital's App. 6-8).

After reviewing Jacob's normal growth chart, Dr. Nichols ruled out "in utero growth retardation" as a potential cause of Jacob's disease. He also ruled out "congenital abnormality" as a possible cause, relying on the fact that multiple physicians had evaluated Jacob and had reported no such abnormality. Dr. Nichols further eliminated "maternal infection" and "uterine malfunction," asserting that the medical records do not indicate any treatment for a known maternal infection post-delivery and that Jacob was successfully delivered through the birth canal. However, this is where Dr. Nichols' elimination of causes ended.

During cross-examination conducted in the trial deposition, Dr. Nichols acknowledged in addition to intrapartum asphyxia/hypoxia (a condition occurring in 1.6 per 10,000 live births) that he could not eliminate (1) toxins, such as nicotine and alcohol, which may have passed through the placenta to Jacob; (2) infection in Jacob, which might explain his elevated white-blood-cell count at birth; (3) a lack of prenatal care during the first trimester; (4) contamination of the amniotic fluid, as such fluid was never tested due to Sandra's withheld consent; and (5) an idiopathic or unknown reason. (Becks' App. 107; 109; 112); (Hospital's App. 6-9). At the end of recross-examination, Dr. Nichols acknowledged that "along with whole lot of other things, there's nothing you can do one way or the other to rule [toxins] in or rule it out." (Becks' App. 112). In other words, he acknowledged that his differential etiology analysis is flawed because it

fails to rule out a number of potential causes of cerebral palsy.[4] In short, Dr. Nichols' opinion is speculative and therefore unreliable.

As discussed above, the trial court has broad discretion in ruling on the admission of evidence under Rule 702. In light of the speculative and unreliable nature of Dr. Nichols' opinion, the trial court did not abuse that discretion.

## CONCLUSION

The trial court did not abuse its discretion in ruling that Dr. Nichols' opinion testimony regarding causation was inadmissible under Rule 702.

Affirmed.

NAJAM, J., and RILEY, J., concur.

---

[4] The Becks contend that it is unfair to require Dr. Nichols to rule out the idiopathic or unknown cause as part of the differential etiology analysis. Because there are four other causes that have not been ruled out, we need not address the Becks' contention. We note, however, that in *Henricksen v. ConocoPhillips Co.*, 605 F.Supp. 2d 1142, 1162 (E.D. Wash. 2009), the court held that in cases where an idiopathic origin is possible, "analysis beyond a differential [etiology] is required." This analysis would include a comparison of the plaintiff's symptoms to known cases of a particular cause. *Id*. at 1162-63.